926 P.2d 1258

STATE of Hawai'i, Plaintiff–Appellee,

v.

Saofaiga LOA Junior, also known as Junior Loa, Defendant–Appellant,

and

Leonard Obon, Defendant.

No. 17790.

Supreme Court of Hawai'i.

Nov. 6, 1996.

Reconsideration Denied Nov. 25, 1996.

336

338

Richard S. Kawana, on the briefs, Honolulu, for defendant-appellant Saofaiga Loa Junior.

James H. S. Choi, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee State of Hawai'i.

Before KLEIN, Acting C.J., and LEVINSON and RAMIL, JJ., Circuit Court Judge HUDDY, in place of MOON, C.J., Recused, and Circuit Court Judge KOCHI, in place of NAKAYAMA, J., Recused.

LEVINSON, Justice.

The defendant-appellant Saofaiga Loa Junior appeals (1) his convictions—pursuant to jury verdicts of guilty—of (a) one count of "attempted reckless manslaughter" (as a supposedly included offense of the charged offense of attempted murder in the first degree), (b) one count of robbery in the first degree, (c) six counts of sexual assault in the first degree, and (d) one count of kidnapping,[1] and (2) his enhanced sentences of (a) seven life terms of imprisonment with the possibility of parole and (b) two twenty-year terms of imprisonment, all nine of which were ordered to run consecutively.

As points on appeal, Loa argues that the trial court erred by: (1) admitting a knife into evidence without proper foundation; (2) denying his right to conduct full cross-examination of a key prosecution witness; (3) denying various defense motions for a mistrial because of: (a) the allegedly erroneous admission of the knife, (b) the prosecution's alleged violation of the trial court's order *in limine* by adducing testimony that one of the assailants had stated, in contravention of Hawai'i Rules of Evidence (HRE) 404(b), that "they [had] just got out of OCCC," and (c) a statement made by the deputy prosecuting attorney (DPA) during closing argument, which Loa claims constituted prejudicial prosecutorial misconduct; and (4) sentencing him arbitrarily and capriciously to extended and consecutive terms of imprisonment, so as to subject him to cruel and unusual punishment.

Although all of Loa's points of error are without merit, we hold that the trial court committed plain error in instructing the jury regarding "attempted reckless manslaughter"—which is nonexistent—as an offense allegedly included within the charged offense of attempted first degree murder. Accordingly, we vacate Loa's conviction of and sentence for attempted reckless manslaughter. In all other respects, we affirm.

## I. BACKGROUND

In the early morning hours of July 3, 1992, Loa and two of his male companions attacked a couple—the complainant and her male companion, a legally blind person—in the park on Magic Island, which is located in the City and County of Honolulu. During the course of the attack, the complainant was repeatedly sexually assaulted (including at least three distinct acts of vaginal intercourse, three of penile penetration of the complainant's mouth, one of digital penetration of the complainant's vagina, and one of digital penetration of the complainant's anus—all by "strong compulsion"), stabbed in the back with a knife, and left naked and bleeding on the beach. Her automobile was stolen. Her male companion was also stabbed repeatedly and left to die. During their ordeal, the complainant and her male companion were continually taunted by their attackers about their ethnicity and imminent deaths. Remarkably, both victims survived.

The complainant testified in detail at trial regarding her ordeal. Her description of the events preceding the attacks produced the following exchange:

[By the DPA:] [Complainant], can you tell us what sort of things Loa asked?

[Complainant:] He asked us how old we are, what nationality we are[,] what school we went to[,] where we live. . . .

Q. . . . [D]id you . . . tell him what nationality you were?

A. Yes, I did.

Q. And did you talk about where you lived and went to school?

---

1. Loa was acquitted of two counts of sexual assault in the first degree and one count of sexual assault in the third degree. The jury was unable to reach a unanimous verdict as to two counts of sexual assault in the first degree.

A. Yes, I did.

Q. Can you tell us what else you guys talked about?

A. We talked about where they came from[;] they were talking about MP's, cops. I heard one of them mention they just got out of OCCC. One of them just got out of—

At this point, defense counsel objected, moved to strike the complainant's remark about OCCC, and also moved for a mistrial on the ground that the remark was extremely prejudicial and violated an order by which the trial court had previously granted a motion *in limine* precluding the prosecution from adducing evidence of Loa's prior criminal history or bad acts. The trial court granted the motion to strike but denied the motion for a mistrial, ruling that the complainant's response was unsolicited and, in any case, that any prejudice to Loa could be cured by a cautionary instruction. The trial court then admonished the jury as follows:

THE COURT: Okay. At this ... point in time the Court is going to instruct the jury to please disregard the last statement made by the witness regarding someone mentioning the fact that they had just been released from OCCC....

The jury is instructed to disregard that and not consider that statement....

One of Loa's codefendants, Leonard Obon, voluntarily agreed to testify as a witness for the prosecution. On cross-examination, defense counsel sought to impeach Obon's testimony as biased by posing a series of detailed questions regarding a plea bargain that Obon had apparently concluded with the prosecution. After a lunch break, the following colloquy ensued:

[By defense counsel:] Now, Mr. Obon, ... let me ask you this. With respect to the plea agreement ... that you cut with the prosecutor, that would be ... Defendant's Exhibit H for identification.

You understand ... [,] with respect to the ... amounts of incarceration[ ] that you could receive under the plea agreement as opposed to going to trial[ ] and ... being convicted as charged, ... that what you really bargained for, in that plea agreement, was a chance ... to go before the Hawaii Parolling [sic] Authority?

[By Obon:] Yes.

Q. Okay. Because if you were convicted as charged of the attempted murder in the first degree, you would never have the chance to go before the parolling [sic] authority; is that right?

The prosecution objected to the question on the ground that its answer would obliquely apprise the jury of the penalty for attempted first degree murder, with which both Loa and Obon were charged. The trial court sustained the objection and directed defense counsel to seek a bench conference if he intended to address the matter of the penalty for that offense in any further questions.

Meanwhile, on direct examination, Obon had been shown a knife that the prosecution had marked for identification as State's Exhibit No. 55 and was attempting to introduce into evidence as the weapon with which Loa had attacked the complainant and her male companion. Obon testified that State's Exhibit No. 55 "looked like" the knife that Loa had used, although he was uncertain that it was the same, believing that the handle of the actual knife might have been made of softer rubber and acknowledging that he could not recall having noticed a serrated edge because he "wasn't really paying attention to the knife or looking at it at the time." The prosecution moved the knife into evidence, and defense counsel objected on the ground of insufficient foundation. The trial court sustained the objection and refused to receive the knife into evidence at that time.

Ferlyn Casintahan, Loa's female companion, who was present on Magic Island during the incident but was not involved in the attacks, was later called as a defense witness. On cross-examination, the DPA asked her to describe the knife that she had seen one of the men carrying earlier during the night in question. Casintahan characterized the knife, which she had personally held for a brief period during the same night, as having a black rubber handle and a grey pointed blade with at least one serrated edge. She then identified State's Exhibit No. 55 as appearing to be the knife that she had observed and handled on the night of the attacks,

testifying that it looked no different than it had on July 3, 1992. The prosecution then renewed its motion for introduction of State's Exhibit No. 55 into evidence. The trial court again denied the motion because, in its view, there was still inadequate foundation as to the knife's length. To rectify the foundational gap, the prosecution elicited testimony from Casintahan that she had seen only one knife during the night in question, that State's Exhibit No. 55 looked like the knife she had seen, and that she had observed one of the attackers with the knife earlier in the evening at the park bathroom.

Over the defense's objection, the trial court then received State's Exhibit No. 55 into evidence, ruling that "there is enough foundation, there is enough relevancy[,]" and ... "everything else goes to weight." The trial court's ruling precipitated a bench conference, during which the following exchange transpired between the court and defense counsel:

THE COURT: ... I don't find ... a lack of foundation for the following reasons: First of all, if I was just to take [Casintahan's] testimony and isolate it, yeah, I'd agree with you that there's a lack of foundation[,] but I can't ignore all the testimony that has been elicited in this trial. When I put all of that together[,] there's very much foundation regarding this knife.

Second, as far as the prejudicial effect, I don't see any. There's no question that the people were stabbed[;] there's no question[,] based on all the testimony that's been elicited, [that] the knife at the minimum was four inches long. I mean everybody has admitted to that[;] that's uncontradicted.

And lastly, there's been no denial of the fact that it was a double edged knife[;] that's been admitted by Obond [sic], by [Casintahan], there—there really is no prejudice. It goes to weight. The foundation is there, the offer has been proffered[,] and because the foundation is there and it is something that is relevant[,] I cannot find it as prejudicial. The knife will come in as ... State's Exhibit 55.

, ....

[DEFENSE COUNSEL]: Will [Y]our Honor give a cautionary instruction to the jury.

THE COURT: Okay.

[DEFENSE COUNSEL]: That the knife is being admitted solely for the purpose of demonstrative evidence.

THE COURT: Oh, no, no, it's not being admitted for demonstrative purposes. That's something you can argue and it goes to a matter of weight. But you can argue and [the DPA] can argue but it's not demonstrative evidence, it's not being offered for demonstrative evidence.

[DEFENSE COUNSEL]: May I inquire of [Y]our Honor something?

THE COURT: Go ahead.

[DEFENSE COUNSEL]: Based on the evidence presented, where did this knife come from?

THE COURT: Are you saying there's a lack of foundation regarding chain of custody?

[DEFENSE COUNSEL]: Chain of custody, recovery, everything.

THE COURT: You will agree with me that this is ... a piece of evidence that's not easily alterable, like drugs or ... food or something that can be easily alterable, you agree with me on that, right?

[DEFENSE COUNSEL]: In general, yes, I do agree.

THE COURT: ... [Y]ou may be able to wipe the knife off if there was any blood, I agree with that. But this is the type of evidence where chain of custody ... is basically nil. All I need to hear for foundation purposes is that the knife is in substantially the same condition as it was ... at the time of the incident[,] and we have had all that.

[DEFENSE COUNSEL]: But she's not saying that that is the knife.

THE COURT: She said it looks like the knife.

[DEFENSE COUNSEL]: That's right. So where did this knife come from?

THE COURT: That's something you can argue. That's everything you can argue to the jury....

[DEFENSE COUNSEL]: Your Honor, it's more than just argument. If this is in fact not the knife, okay, the jurors are going to be left with the impression that this was the weapon.

THE COURT: [Defense counsel], my instructions are going to be such that [the jury] can ... give the amount of weight which they feel should be given to any piece of evidence.

. . . .

[DEFENSE COUNSEL]: Would ... [Y]our Honor agree with me that with respect to an article like this, it can be manufactured, you can have identical knives?

THE COURT: No doubt about it[;] that's why it goes to weight.

[DEFENSE COUNSEL]: It doesn't go to weight[,] if you introduce it to show that this was the weapon that he in fact had.

. . . .

THE COURT: Finish up your record[;] you're not going to convince me.

[DEFENSE COUNSEL]: Your Honor, I think it would be a serious ... miscalculation if you were to introduce this evidence as requested by the prosecutor. . . .

. . . .

THE COURT: I'm going to state for the record just to refresh—you probably know this already, you remember it, but Obond [sic] testified that that knife looked exactly like the knife ... on the night of the incident except for the handle[;] it was the grip ... [or] something that wasn't similar to the knife that he had. He testified that everything else, the blade, the size, everything looked exactly like that knife that was used that evening. Okay. With that the objection is overruled. Court's admitting into evidence State's Exhibit 55. Okay. Thank you.

In the course of redirect examination, defense counsel requested that the court reconsider its ruling; the trial court declined to do so, noting that "it all goes to weight. The foundation is there, ... the balancing has been done[,] and your questions did nothing more than to attack the weight of the evidence[.]" As "one last point, in order to complete [the] record," defense counsel moved for a mistrial based on the receipt of State's Exhibit No. 55 into evidence. The trial court denied the motion.

Loa did not testify in his own defense.

After the close of the evidence, defense counsel's final argument to the jury included the following:

Good morning ladies and gentlemen of the jury.

Ladies and gentlemen, over the course of the last ... two weeks now you've heard a lot of evidence. Let me go over ... a couple of points at the outset here.

. . . .

Shut the fuck up or I'll kill you. Did you ever fuck [the complainant] before? If you're nice we'll let her sit on your face while you bleed to death. If it wasn't for the fact that you're oriental your life would be spared. Still alive? I'm going to kill you. So you don't run away, I'm going to stab you in the leg.

I want no witnesses, I got too much to live.

By this time tomorrow morning[,] the front page of the newspaper will have something to the effect of a dead couple found at Magic Island.

These words, ladies and gentlemen, are just that, they are words. They do not match the conduct in this case that has been described to you from the witness stand, the results of the conduct. There's no match between the words and the conduct to establish that the prosecution has proven the offense of Attempted Murder in the First Degree beyond a reasonable doubt.

These statements, when you look at them and in the context of what happened and what didn't happen[,] were cruel words, they were terrible words, they were words meant to frighten, to scare, to intimidate both [the complainant and her male companion] into inaction.

[The male companion] was stabbed five times with a knife. You've heard testimony from the doctors, from [the male com-

panion] himself, of two stab wounds to the chest, a stab wound to the back, two stab wounds to the leg.

[The male companion] ... made no [statement] to the person who was stabbing him to give that person a belief ... that he was dying. In other words, help me[,] I need an ambulance, you know, I'm bleeding to death, I'm going to pass out or anything.

According to his testimony, he does not ask for help from the person ... to the extent that it would engender any sort of concern in the individual that the person was in immediate need of medical assistance.

Now, I'm not saying that he wasn't seriously injured, but at all times the give and take between the two indicated callous, cruel conduct in terms of inflicting the wounds and yet at the same time an understanding, an awareness that the person was alive.

. . . .

Similarly, one stab wound to the back of [the complainant], this wound bled, ... and think about it this way[;] the same person who supposedly repeatedly stabbed [her male companion] and knows that he's not dead stabs her one time to the back. In the context of don't go to the police, lie down on the sand, don't go to the police, we don't want you running to the police, we don't want you following us. That's her testimony.

This one stab wound was all that was done[,] and it appears [that] all that was intended [was that it penetrate] about an inch[,] according to Dr. Burkle. Does that display an intent to kill the person? That the conscious object was to kill the person as opposed to just hurt the person there[?]

. . . .

If the injuries that you saw, the extent of the injuries, I'm not saying anybody should have died, if the extent of the injuries were as they were, it's because Mr. Loa did not intend to kill, did not stab the person with the intent of causing death of two or more people, with the conscious object to cause the death of two or more people, to stab them with the knowledge, the awareness that it was practically certain that they would die.

In rebuttal to the foregoing defense argument, the DPA responded in the following fashion:

[Defense counsel] can come up and tell you to ignore the knife, he can tell you to ignore the doctors, ignore the statements. But, ladies and gentlemen, that's the evidence. And when you go back into the jury room you can look at that evidence and you should look at it and you'll see that evidence points to one thing and one thing only[;] when he stabbed [the complainant], when he stabbed [her male companion,] he left [them] for dead. Just like he said; like he said, like he did.

. . . .

[Defense counsel,] in his whole argument up here, did he ever say that his client didn't do this stuff? Did he ever tell you that his client didn't rape [the complainant] all those times? Did he ever tell you that his client didn't stab [her male companion] in the chest twice and poke his finger in it? I didn't hear it.

At this point, defense counsel objected to the DPA's rebuttal argument and moved for a mistrial, contending that "the last series of remarks" implied that Loa was subject to a burden of proof and "convey[ed] to the jury that ... Loa should have taken the stand to testify." The DPA retorted that "this is rebuttal[;] I said specifically [that, when defense counsel] got up on his closing arguments[,] he never denied that his client did this[,] and ... I'm entitled to get into it." The trial court denied defense counsel's motion, indicating that the DPA's remarks were not evidence and that the court construed the DPA's argument to be that defense counsel had not controverted certain facts in the record, rather than that Loa had declined to testify.

During its deliberations, the jury transmitted a written communication to the trial court, inquiring as follows:

What do we do now on Count I, Attempted Murder in the First Degree? We are unable to reach a unanimous decision. Do we now have to consider Attempted

Manslaughter or are we deadlocked and stop deliberating on Count I? Some jurors are not willing to settle for a lesser charge.

With the concurrence of counsel for the parties, the trial court responded, "Please re-read the attached instructions," and furnished the jury with written copies of the instructions that it had previously given orally regarding the offense of attempted first degree murder and the offenses "included" therein. Those instructions included the following, which the trial court had read to the jury as modified by agreement of the parties:

In Count I of the Indictment, the Defendant, Saofaiga Loa, Jr. is charged with the offense of Attempted Murder in the First Degree.

A person commits the offense of Attempted Murder in the First Degree if he intentionally engages in conduct which is a substantial step in a course of conduct known to cause the deaths of two or more persons in the same or separate incident.

There are two material elements to the offense of Attempted Murder in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That Saofaiga Loa, Jr. intentionally engaged in conduct.

2. [That] [t]he conduct, under the circumstances as Defendant Loa believed them to be, constituted a substantial step in a course of conduct intended or known to cause the deaths of [the complainant] and [her male companion] in the same or separate incident.

If and only if you find the Defendant Saofaiga Loa, Jr. not guilty of Attempted Murder in the First Degree, or you are unable to reach a unanimous verdict as to the offense of Attempted Murder in the First Degree, then you must determine whether Saofaiga Loa, Jr. is guilty or not guilty of the lesser included offense of Attempted Manslaughter.

A person commits the offense of Attempted Manslaughter if he intentionally engages in conduct intended or known to recklessly cause the death of another person.

There are two elements to the offense of Attempted Manslaughter, each of which must be proven by the prosecution beyond a reasonable doubt. The two elements are:

1. That the Defendant, Saofaiga Loa, Jr., intentionally engaged in a course of conduct; and

2. That Defendant Loa consciously disregarded a substantial and unjustifiable risk that his conduct would be intended or known to recklessly cause the deaths of [the complainant] and [her male companion].

After further deliberation,[2] the jury returned the verdicts described above, including, *inter alia,* a guilty verdict as to the "lesser included offense" of attempted manslaughter.

Prior to sentencing, the prosecution filed a motion for imposition of extended terms of imprisonment, pursuant to Hawai'i Revised Statute (HRS) §§ 706–661 (1993)[3] and 706–662(4) and (5) (1993),[4] on the bases that Loa

---

2. In all, the trial court received twelve written communications from the jury. The subject matter and sheer volume of the jury communications suggest careful and in-depth scrutiny of all of the offenses charged in the indictment.

3. HRS § 706–661 provides:

**Sentence of imprisonment for felony; extended terms.** In the cases designated in section 706–662, a person who has been convicted of a felony may be sentenced to an extended indeterminate term of imprisonment. When ordering such a sentence, the court shall impose the maximum length of imprisonment which shall be as follows:
(1) For a class A felony—life;
(2) For a class B felony—twenty years; and

(3) For a class C felony—ten years.
The minimum length of imprisonment shall be determined by the Hawaii paroling authority in accordance with section 706–669.

4. HRS § 706–662 (1993) provided in relevant part:

**Criteria for extended terms of imprisonment.** A convicted defendant may be subject to an extended term of imprisonment under section 706–661, if the convicted defendant satisfies one or more of the following criteria:
. . .
(4) The defendant is a multiple offender whose criminal actions were so extensive that a sentence of imprisonment for an ex-

was a "multiple offender," an "offender against the handicapped," or both. The prosecution's motion also urged that all indeterminate prison terms to which Loa might be sentenced should be served consecutively. Loa, in turn, moved to be sentenced as a "young adult defendant," pursuant to HRS § 706–667 (1993).[5]

At the sentencing hearing, during which the trial court considered the motions for extended term imprisonment and for sentencing as a youthful offender, the prosecution offered eight police reports as exhibits for receipt into evidence, together with supporting witnesses, concerning incidents—extraneous to the offenses for which Loa was to be sentenced—involving Loa. Each of these incidents related to alleged prior bad acts entailing criminal conduct on Loa's part for which he had not been convicted or which were otherwise "pending." Over Loa's objection, the trial court "received" the exhibits, ruling that,

at this point in time, . . . the Court is going to receive [them;] whether it considers [them] or not is yet to be determined. And until and unless I am persuaded that [they have] merit . . . and substance to [them], and also that [they are] not a violation of any due process, . . . and due pro-

cess rights at the time of sentencing are very limited, the Court will not make any ruling [as to their significance] at this point in time. So as such, I am going to allow [them] into evidence over objection.

At the trial court's invitation, the prosecution made offers of proof regarding the testimony that each witness would give; defense counsel was accorded the opportunity to cross-examine each witness, subject to redirect and re-cross. The witnesses then testified with respect to various incidents in which Loa allegedly assaulted, robbed, or threatened a number of persons and damaged property. The complainant and her male companion also made statements to the court regarding the impact that Loa's offenses against them had had on their lives.

At the conclusion of the evidentiary phase of the sentencing hearing, and after the delivery of oral statements to the court by the complainant and her male companion, the arguments of counsel, and Loa's allocution, the trial court delivered the following remarks:

The only question[s] that remain[ ] at this point in time [are:] one, whether the terms will run consecutively or concurrent-

---

tended term is necessary for protection of the public. The court shall not make such a finding unless:
(a) The defendant is being sentenced for two or more felonies or is already under sentence of imprisonment for felony; or
(b) The maximum terms of imprisonment authorized for each of the defendant's crimes, if made to run consecutively would equal or exceed in length the maximum of the extended term imposed, or would equal or exceed forty years if the extended term imposed is for a class A felony.
(5) The defendant is an offender against the elder, handicapped, or minor under the age of eight whose imprisonment for an extended term is necessary for the protection of the public. The court shall not make such a finding unless:
(a) The defendant attempts or commits any of the following crimes: murder, a sexual offense which constitutes a felony under chapter 707, robbery, felonious assault, burglary, and kidnapping; and
(b) The defendant, in the course of committing or attempting to commit the crime, inflicts serious or substantial bodily injury upon a person who is:

. . .
(ii) Blind . . .; [and]
(c) Such disability is known or reasonably should be known to the defendant.
Effective April 10, 1996, the legislature amended HRS § 706–662 cosmetically and substantively. 1996 Haw. Sess. L. Act 3, § 1 at 3–4. The amendments are not material to this appeal. *Id.*, § 2 at 4.

5. HRS § 706–667 provides in relevant part:
 **Young adult defendants.** (1) Defined. A young adult defendant is a person convicted of a crime who, at the time of sentencing, is sixteen years of age or older but less than twenty-two years of age, and who has not been previously convicted of a felony as an adult or adjudicated as a juvenile for an offense committed at age sixteen or older which would have been a felony had the young adult defendant been an adult.
The trial court denied Loa's motion for "youthful offender" sentencing, noting that defense counsel had effectively conceded that such sentencing was unwarranted under the circumstances of the case.

ly; and two, whether or not the Court will extend these terms of imprisonment.

. . . .

. . . In imposing a sentence consecutively, the Court needs to look at the following factors: [6]

One, and this is mandated by statute, Mr. Loa, the nature and circumstances of the offense and the history and characteristics of the defendant;

Two, the need for the sentence to be imposed so that (a), it would reflect the seriousness of the offense, and promote respect for law and provide just punishment; and (b), afford adequate deterrence to criminal conduct; and (c), protect the public from further crimes; and (d) provide the defendant with needed rehabilitation;

Thirdly, the Court needs to look at what sentences are available. And we can dispose of that factor immediately since I am mandated to impose a sentence of incarceration.

And lastly, . . . the need to avoid unwarranted disparities among the defendant with other defendants who have been found guilty of similar conduct.

Now, I'm not going to address each one of these factors individually, because basically they can be addressed together[;] nor do any of these factors have any priority. So as such, the Court needs to look at these things basically together.

. . . .

. . . [A] lot has been said about this incident by people, and the Court has told you on many occasions that it has tried to insulate itself from any reaction[,] and I believe that this Court has done so. So whatever people have said about this incident has not affected this Court one iota.

. . . .

. . . [T]his Court must rationally and dispassionately . . . impose sentence in this matter. . . . [I]t's very difficult for this Court in this case to impose sentence for the following reasons:

First of all, . . . you, Mr. Loa are . . . a very young person, . . . that's undeniable. You've mentioned the fact that you are a human being, and that's correct, you are. You have mentioned the fact that you have come from a dysfunctional family, you have been abused both physically and sexually throughout your life, and based on the presentence report, . . . that would be undeniable.

. . . .

Nevertheless, returning to your . . . youthful behavior. As everyone knows, . . . I was a Family Court Judge; I dealt with that calendar, been involved with those type[s] of crimes[;] I've been involved with the youth, trying to help our youth into various programs [to assist them] in straightening out their lives. I think I've seen acts which I can say are acts of immaturity, which are acts of grow-

**6.** HRS § 706–668.5 (1993) provides in relevant part:

> **Multiple sentence of imprisonment.** (1) If multiple terms of imprisonment are imposed on a defendant at the same time, . . . the terms may run concurrently or consecutively. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms run consecutively. . . .
>
> (2) The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider the factors set forth in section 706–606.

HRS § 706–606 (1993) provides:

> **Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider:
>
> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) The need for the sentence imposed:
> (a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;
> (b) To afford adequate deterrence to criminal conduct;
> (c) To protect the public from further crimes of the defendant; and
> (d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) The kinds of sentences available; and
> (4) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

For a discussion of the evolution of HRS § 706–668.5 and its relation to HRS § 706–606, *see State v. Gaylord*, 78 Hawai'i 127, 144–50, 890 P.2d 1167, 1184–90 (1995).

ing pains. Unfortunately for you, Mr. Loa, I cannot say that what occurred on July 3rd, 1992, was an act of immaturity or an act of a youth growing up. . . .

Youth is the only factor [on the basis of which] you, through your attorneys, are asking this Court to sentence you to one term of life imprisonment. As I stated, the factors that I need to look at [are] the nature and circumstances of the offenses, your history[,] and your character. I've alluded to that, and that's what makes it difficult.

You, Mr. Loa, obviously, . . . are a victim yourself. And I think that's a testament to our entire society and our entire community. We need to do as parents, as teachers, as political leaders, as judges, as lawyers, as doctors, as everybody else, a better job with the problems in our community and our society. That's obvious. However, and as [defense counsel] has pointed out, that does not excuse the conduct that had occurred on this evening.

These people were innocent people. They didn't provoke anything. They didn't do anything. They didn't say anything. They were enjoying what they were doing, just like you were enjoying what you were doing. They were innocent people and frail people physically. . . . [The complainant] can't be more that five feet, 90 pounds. [Her male companion] can't be more than the same. Both physically, in this court's mind, [are] weak. Yet, you took it upon yourself and your friends to prey . . . on those people.

You mentioned in your statement to me today that [yours] was an intention to rob. There was an intention there. There was an intention to commit an act of violence. And from that, what happened, there's no rationale. There's no rationale to repeatedly have sex with a woman who does not want to have sex with you. There's no rationale to stab someone four times when that person is not only physically smaller than you, but . . . shows no restraint to what you're doing. There's no reason to take from someone what is not yours, and that's exactly what happened on this night. And to a certain extent, I have to agree

that it could have happened to anyone who just happened to be there at the park that evening, and that I cannot ignore. I cannot ignore the totally . . . inhumane treatment that these people suffered.

The testimony that was elicited during the trial is what I'm basing my decision upon. The facts stated at the trial during these sexual acts [—] your actions, your words [—] speak for [themselves], and I'm not going to rehash them again. Your actions and your words in stabbing speak for themsel[ves,] and I'm not going to mention them again. It is appalling, it is senseless[,] and it is, again, as I stated earlier, inhumane.

The prosecution has brought forward some people who have testified that they know you. I'm not giving any weight to the act[s] [themselves] because[,] otherwise, we definitely would be involved in some mini trials. But they do indicate and . . . corroborate the way that you have been taught to react. And like I said, you are a victim of that, . . . but that's the way you react[,] and this night demonstrates it. You react to situations violently. You react to situations in a way that shows nothing but disrespect for the laws of this community.

You know, I had mentioned justice, and justice in this court's mind is the upholding of our judicial system and the laws and statutes and rules of this country and this state and this county. That's what this office stands for, that's the oath that I took when I became a judge[,] and I respect the dignity and the prestige of this office[,] and I intend to uphold it. And that's my sense of justice. You have a sense of justice, the victims in this case have a sense of justice, and everyone in this community has a sense of justice, and I'll bet a nickel, because I'm not a betting person, that everyone's definition of justice is different. And really, whatever sentence I impose today will [not] be . . . satisfactory, I assume, to many people, but that doesn't concern me.

. . . .

. . . Mr. Loa, your conduct is very troubling to the Court because there's no rational answer to what occurred on that

night. Youth cannot be used as an excuse, Mr. Loa. Drinking cannot be used as an excuse.... I look at the facts of this case, I look at the presentence report, and what I see here, Mr. Loa, is you as a person, you have your own separate world. You live your laws and society lives theirs....

....

Is there a chance for rehabilitation in this case? I can't answer that, Mr. Loa. I don't have a crystal ball in front of me and I don't know what's going to help you address the problems that you have.... I wish I did....

The community needs protection from ... these types of acts and from you, Mr. Loa[;] there's no doubt in my mind. When I put all of these factors together that I stated ..., I'm sorry, but it's too late now[;] the damage is done....

After articulating the foregoing thought processes, the trial court granted the prosecution's motion for extended terms of imprisonment, based on Loa's status as a "multiple offender" within the meaning of HRS § 706–662(4), *see supra* note 4, and consecutive sentencing. Accordingly, the trial court entered a judgment sentencing Loa to seven indeterminate terms of life imprisonment with the possibility of parole in connection with Loa's class A felony convictions (sexual assault in the first degree and robbery in the first degree) and two indeterminate twenty-year terms of imprisonment in connection with Loa's class B felony convictions (attempted manslaughter and kidnapping).

Loa filed a timely notice of appeal.

## II. *STANDARDS OF REVIEW*

### A. *Evidentiary Rulings*

The standard on appeal for review of evidentiary rulings depends on the particular rule of evidence at issue. *Kealoha v. County of [Hawai'i]*, 74 Haw. 308, 319, 844 P.2d 670, 676, [*reconsideration denied*, 74 Haw. 650, 847 P.2d 263] (1993). Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard. *Id.*

*State v. Baron*, 80 Hawai'i 107, 113, 905 P.2d 613, 619, *reconsideration granted in part and denied in part*, 80 Hawai'i 187, 907 P.2d 773 (1995) (some brackets in original and some added). "This court reviews questions of relevancy, within the meaning of Hawai'i Rules of Evidence (HRE) Rules 401 ... and 402 ... under the 'right/wrong' standard, inasmuch as the application of those rules 'can yield only one correct result.'" *State v. Wallace*, 80 Hawai'i 382, 409, 910 P.2d 695, 722 (1996) (quoting *Kealoha*, 74 Haw. at 319, 844 P.2d at 676) (footnotes omitted). "[T]he determination of the admissibility of relevant evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion because it requires a cost-benefit calculus and a delicate balance between probative value and prejudicial effect[.]" *Baron*, 80 Hawai'i at 113, 905 P.2d at 619 (quoting *Kealoha*, 74 Haw. at 315, 844 P.2d at 674) (internal quotation marks omitted) (brackets in original).

#### 1. *Foundation*

When a question arises regarding the necessary foundation for the introduction of evidence, "[t]he determination of whether proper foundation has been established lies within the discretion of the trial court[,] and its determination will not be overturned absent a showing of clear abuse." *State v. Joseph*, 77 Hawai'i 235, 239, 883 P.2d 657, 661 (App.1994) (citation omitted).

#### 2. *Scope Of Cross-Examination*

"The scope and extent of cross and recross-examination of a witness is within the sound discretion of the trial judge. Under this standard, we will not disturb the trial court's exercise of its discretion unless it is clearly abused." *State v. Jackson*, 81 Hawai'i 39, 47, 912 P.2d 71, 79 (1996) (citations omitted).

### B. *Rulings On Motions For Mistrial*

When prosecutorial misconduct is the basis for a motion for mistrial, a new trial is warranted only where "the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. Kupi-*

*hea,* 80 Hawai'i 307, 316, 909 P.2d 1122, 1131 (1996) (quoting *State v. McGriff,* 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994)). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the reviewing court] consider[s] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against [the] defendant." *Id.* (quoting *State v. Agrabante,* 73 Haw. 179, 198, 830 P.2d 492, 502 (1992)).

█ "Because the declaration of a mistrial is discretionary on the part of the trial court, we review the court's action on an abuse of discretion standard." *State v. Lam,* 75 Haw. 195, 201, 857 P.2d 585, 589 (1993) (citations omitted). The same is true with respect to the denial of a mistrial. *State v. Iaukea,* 56 Haw. 343, 354, 537 P.2d 724, 732 (1975); *see also State v. Samuel,* 74 Haw. 141, 148, 838 P.2d 1374, 1378 (1992).

### C. *Sentencing*

█ "The authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." *State v. Valera,* 74 Haw. 424, 439, 848 P.2d 376, 383, *reconsideration denied,* 74 Haw. 650, 853 P.2d 542 (1993). In other words,

> while a sentence may be authorized by a constitutionally valid statute, its imposition may be reviewed for plain and manifest abuse of discretion.
>
> Admittedly, the determination of the existence of clear abuse is a matter which is not free from difficulty[,] and each case in which abuse is claimed must be adjudged according to its own peculiar circumstances....

*State v. Kumukau,* 71 Haw. 218, 227–28, 787 P.2d 682, 688 (1990) (citations and internal quotation marks omitted). *See also State v. Murray,* 63 Haw. 12, 25, 621 P.2d 334, 342–43 (1980).

In order to facilitate appellate review for abuse of a trial court's sentencing discretion, and "[w]henever a defendant is qualified for sentencing alternatives and the sentence imposed is unsatisfactory to the defendant, we strongly encourage and recommend that ... the sentencing court ... state its reasons for imposing the particular sentence." *State v. Lau,* 73 Haw. 259, 265, 831 P.2d 523, 526 (1992).

*State v. Gaylord,* 78 Hawai'i 127, 143–44, 890 P.2d 1167, 1183–84 (1995) (some ellipsis points in original and some added).

### D. *Abuse Of Discretion*

█ "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party-litigant." *Jackson,* 81 Hawai'i at 47, 912 P.2d at 79 (citation and internal quotation marks omitted).

### E. *Plain Error*

█ Pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." This court's power to deal with plain error "is one to be exercised with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *Raines v. State,* 79 Hawai'i 219, 226, 900 P.2d 1286, 1293 (1995) (quoting *State v. Kupau,* 76 Hawai'i 387, 393, 879 P.2d 492, 498 (1994)); *State v. Fox,* 70 Haw. 46, 56, 760 P.2d 670, 675–76 (1988). "[T]he decision to take notice of plain error must turn on the facts of the particular case to correct errors that 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *Fox,* 70 Haw. at 56, 760 P.2d at 676 (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

*State v. Lee,* 83 Hawai'i 267, 274, 925 P.2d 1091, 1098 (Haw.1996).

### F. *Erroneous Jury Instructions And Nonexistent Offenses*

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, *erroneous,* inconsistent, or misleading.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Holbron,* 80 Hawai'i 27, 32, 904 P.2d 912, 917, *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995) (citations, footnote, brackets, and quotation signals omitted) (emphasis in original).

"[T]here can be no offense of 'attempted manslaughter' within the meaning of HRS § 707–702(1)(a)[.]" *Id.* at 45, 904 P.2d at 930. Thus, a jury instruction purporting to describe that nonexistent offense is erroneous. *Id.*

### III. *DISCUSSION*

A. *The Circuit Court Did Not Reversibly Err Either By Receiving The Knife Into Evidence Or By Restricting Obon's Testimony On Cross–Examination.*

1. *Receipt of the knife into evidence*

HRE 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence to support a finding that the matter in question is what the proponent claims."

In *Joseph, supra,* the Intermediate Court of Appeals succinctly delineated the analysis by which a trial court determines whether sufficient foundation has been laid for the admission of physical evidence.

Simple logic dictates that the party wishing to introduce an item in evidence must present proper proof of its authenticity and identification. In other words, the proponent of the evidence must prove that the item is what the proponent claims it is. The proponent of the item must lay the foundation for its receipt in evidence in order to prevent inadmissible evidence from being suggested to the jury by any means.... Proper identification and foundation are established when the prosecution shows that the exhibit is connected with the crime and identified as such. Evidence is admissible if the court, in the exercise of its wide discretion in such matters, decides that sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.

*Joseph,* 77 Hawai'i at 239, 883 P.2d at 661 (citations and quotation marks omitted).

In his appellate brief, Loa attacks the trial court's receipt of the knife (State's Exhibit No. 55) into evidence on two grounds. First, he contends that "there was insufficient foundational testimony that [State's Exhibit No. 55] was, in fact and in truth, *the* knife used" (emphasis in original), and, for that reason, "[t]he knife ... was irrelevant because it did not 'make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence' as required by HRE 401."[7] Second, he argues that, even if State's Exhibit No. 55 had relevance,

---

7. HRE 401 provides that " '[R]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States and the State of [Hawai'i], by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible."

it should have been excluded under HRE 403.[8]

■■■ We disagree with Loa's contentions for three reasons. First, the prosecution was eventually able to adduce testimony that, if believed, established that State's Exhibit No. 55 was the knife that Loa used to stab the complainant and her male companion. Obon testified that the exhibit "looked like" the knife that had been used, although he was uncertain that it was the same one. Although the trial court correctly ruled that Obon's testimony, standing alone, was insufficient to lay the necessary foundation for admitting State's Exhibit No. 55 into evidence, Casintahan later testified that: (1) on the night of the incident, she had personally held a knife; (2) she had observed one of the attackers in possession of the knife near the bathroom of the park at Magic Island; (3) she had only seen one knife during the night of the incident; (4) the knife had had a black rubber handle and a grey pointed blade with at least one serrated edge; (4) State's Exhibit No. 55 appeared to be the knife in question; and (5) State's Exhibit No. 55 was in the same condition as the knife that she had observed on the night of the incident. Inasmuch as the prosecution was not required to prove to an absolute certainty that State's Exhibit No. 55 was the "attempted murder weapon," we hold that the trial court did not commit a clear abuse of discretion in ruling that "enough foundation" had been laid to identify State's Exhibit No. 55 as the knife that Loa used to stab the complainant and her male companion. *See Joseph,* 77 Hawai'i at 239, 883 P.2d at 661.[9]

■■■ Second, inasmuch as sufficient foundation was laid to identify State's Exhibit No. 55 as the knife that caused the complainant's and her male companion's stab wounds, the exhibit was clearly relevant for purposes of HRE 401, inasmuch as its attributes made a fact of consequence to the determination of the action—*i.e.,* the likelihood that the complainant's and her male companion's injuries were life-threatening—more or less probable than it would be without the evidence. Accordingly, we hold that the trial court correctly ruled that "there [was] enough relevancy" to admit State's Exhibit No. 55 into evidence.

■■■ Third, the probative value of State's Exhibit No. 55 was by no means "substantially outweighed by the danger of unfair prejudice" to Loa for purposes of HRE 403. Indeed, we fail to perceive that the exhibit was legally "prejudicial" to Loa at all, once sufficient foundation had been laid and its relevance established. As the trial correctly observed, it was for the jury to determine the weight and effect of the evidence. We therefore hold that the trial court, having "done the balance," did not commit an abuse of discretion in admitting State's Exhibit No. 55 into evidence.[10]

8. HRE 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

9. The record appears to be devoid of any testimony regarding the means by which the prosecution came into possession of State's Exhibit No. 55, much less any evidence of the chain of custody thereafter. Although, for the reasons stated above, the trial court did not commit a clear abuse of discretion in deeming the factual foundation sufficient to receive State's Exhibit No. 55 into evidence in the present case, the prosecution's failure to elicit this evidence is inexplicable and—at the very least—reflects shoddy trial practice that would, under other circumstances, be fatal to an attempt to introduce a proffered exhibit into evidence.

Assuming *arguendo,* however, that the trial court's receipt of State's Exhibit No. 55 into evidence was erroneous, the error was harmless beyond a reasonable doubt. Loa's use of a knife (virtually identical in all material respects to State's Exhibit No. 55) to inflict potentially life-threatening injury on the complainant and her male companion was uncontroverted. The record is replete with lay and expert testimony regarding Loa's use of the knife and the nature and extent of the injuries resulting therefrom. Moreover, the jury's inability to reach a unanimous agreement that Loa intentionally attempted to cause his victims' deaths bolsters our firm conviction that he was not prejudiced by the admission of the exhibit in question.

10. Because the trial court did not err in admitting State's Exhibit No. 55, it likewise did not commit an abuse of discretion in denying Loa's motion for a mistrial, which was predicated upon its allegedly erroneous admission. In any event, we note that, although Loa raised the

### 2. *Restriction of Obon's testimony*

 Loa's next contention—that the trial court erred in restricting Obon's testimony regarding the plea agreement that Obon had reached with the prosecution in connection with the charges pending against him in the present matter—is swaddled in the mantle of the confrontation clauses contained in the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution.[11] Loa's arguments, however, do not support his claim that his constitutional right of confrontation was infringed with respect to his opportunity to cross-examine Obon. This court has recognized that

> [i]mplicit in a defendant's right to confront witnesses against him, is his right to cross-examine and to impeach the confronted witness. However, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the trial process. Furthermore, the law is well-settled that the admissibility of evidence, generally, and the scope of cross-examination at trial are matters exercised within the discretion of the trial court.

*State v. Okumura,* 78 Hawai'i 383, 399, 894 P.2d 80, 96 (1995) (citations, quotation signals, brackets, and ellipsis points omitted).

So long as the trial court allows the defense an adequate opportunity to raise the issue of a witness' possible bias, we have held that a defendant's constitutional right of confrontation has not been violated. *Id.* at 400, 894 P.2d at 97.

In the present case, Loa's counsel was permitted, on cross-examination, to elicit extensive testimony from Obon regarding the details and implications of his plea agreement with the prosecution, including the benefits that would potentially accrue to Obon by virtue of his cooperation.[12] The trial court restricted cross-examination only to the extent that Loa's counsel sought to adduce testimony disclosing the statutorily mandated sentence—life imprisonment without the possibility of parole—that would result from a conviction of attempted first degree murder, which was one of the offenses with which Loa was charged.

In sustaining the prosecution's objection to defense counsel's question, the court explained:

> I'm not going to allow that question to be asked because it does get more or less to the bottom line [regarding] a sentence with no possibility of getting out of jail. That's exactly what [is] prejudicial in this case.
>
> Let me just expand on the record on that[;] the prejudicial effect of allowing the

denial of the motion for mistrial as a point of error on appeal in his opening brief, he essentially abandoned the point by failing to support it through argument, as required by Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7).

11. The sixth amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" The confrontation clause of the sixth amendment is applicable to the states through the due process clause of the fourteenth amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *State v. Adrian,* 51 Haw. 125, 131, 453 P.2d 221, 225 (1969). Article I, section 14 of the Hawai'i Constitution (1978) provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against the accused[.]"

12. In the course of cross-examining Obon, defense counsel extracted testimony disclosing that: (1) Obon had entered into a plea agreement from which he perceived he had benefited; (2) as part of the plea agreement, Obon would testify against Loa; (3) the plea agreement was concluded only one week prior to Loa's trial, while Obon was incarcerated; (4) if Obon had not agreed to the plea bargain, he would have been obliged to stand trial on multiple felony charges, including attempted murder, robbery, and unauthorized control of a propelled vehicle; (5) Obon would be subject to a substantial sentence if convicted; (6) Obon's sentence would likely be less severe if he were convicted after testifying against Loa pursuant to the plea agreement; (7) the sentence for attempted first degree murder was the most severe allowed under Hawai'i law; (8) as part of his plea agreement, Obon was to receive a letter to the Hawai'i Paroling Authority from the Prosecutor's Office designed to assist him in obtaining parole at a later date; (9) Obon would be eligible for parole if he were sentenced in accordance with the plea agreement, but not if he were convicted of the offenses originally charged against him; and (10) prior to Obon's entering into the plea agreement, Loa's defense counsel had asked to meet with him, but Obon had refused.

jury to hear what the sentence is cuts both ways[;] it cuts both ways for [Loa].

. . . .

And it cuts both ways for [Loa] because[,][out] of sympathy for him, [the jurors] may ... find [Loa] not guilty of one attempted murder if they know what the penalty is[;] on the other hand[,] if they know what the penalty is[,] they may find [Loa] guilty because that's exactly [the penalty] they want him to [serve;] so that's why I am not allowing you to get into the specifics.

In our view, the trial court's reasoning in support of its modest restriction of Loa's cross-examination of Obon was sound and cogent. Under the circumstances, Loa was permitted adequately to raise the issue of Obon's possible bias, while at the same time avoiding the risk of prejudicing the jury— either for or against Loa. Accordingly, we hold that the trial court did not commit a clear abuse of discretion in ruling as it did.

B. *The Trial Court's Denial Of Loa's Motions For A Mistrial Did Not Constitute Abuses Of Discretion Because, Beyond A Reasonable Doubt, The Complainant's Challenged Testimony Did Not Contribute To The Verdicts Obtained, And The DPA Did Not Commit Misconduct In His Closing Argument.*

1. *Motion for mistrial based on the complainant's testimony*

■■■ Loa maintains that the trial court's denial of his motion for a mistrial following the complainant's testimony—which he characterizes as "stating that [Loa] and his friends had just gotten out of prison before the incident in question"—constituted reversible error.

We believe that Loa overreaches in his characterization of the complainant's testimony, inasmuch as the complainant never expressly indicated that she understood Loa to be one of the individuals who had "just got out of OCCC." *See* section I. of this opinion, *supra* at 1262. Be that as it may, and in light of the overwhelming evidence of Loa's guilt, whatever minimal prejudice may have resulted from the complainant's revelation of

what one of her unidentified attackers had stated about his past criminality was adequately cured by the trial court's immediate cautionary instruction to the jury. In this regard, we adhere to this court's analysis in *State v. Kahinu*, 53 Haw. 536, 498 P.2d 635 (1972), *cert. denied*, 409 U.S. 1126, 93 S.Ct. 944, 35 L.Ed.2d 258 (1973):

... [T]he deliberate and unresponsive injection by prosecution witnesses of irrelevant references to prior arrests, convictions, or imprisonment may generate insurmountable prejudice to the cause of an accused. Such wielding of the "evidential harpoon" may compel the trial court to declare a mistrial, whether it appears that the testimony was deliberately induced by the prosecutor, or through the overzealousness of the ... witness. Indeed, ... an immediate cautionary instruction by the court to the jury may be insufficient to cure the prejudice.

But this is not always the case. As a general rule, it is for the [trial] court to determine whether a situation involving the use of the "evidential harpoon" merits a mere prophylactic cautionary instruction or the radical surgery of declaring a mistrial. We are satisfied that the instant case merits application of the rule stated in *Tucker v. United States*, 431 F.2d 1292, 1293 (9th Cir.1970):

... [T]he reception of evidence pertaining to prior convictions [or imprisonment] ... may, under the circumstances of a particular case, be harmless beyond a reasonable doubt, applying the principle announced in *Chapman v. California*, 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] ... (1967). Under *Chapman*, an error of constitutional proportions can be disregarded as harmless if the prosecution proves beyond a reasonable doubt that the error "did not contribute to the verdict obtained." 386 U.S. at 24 [87 S.Ct. at 828]. ...

*Kahinu*, 53 Haw. at 549–50, 498 P.2d at 643–44 (citations omitted) (some brackets and ellipsis points in original and some added).

We hold, beyond a reasonable doubt, that the complainant's testimony regarding the recent release from OCCC of one or more of

her assailants did not contribute to the guilty verdicts in this case. Accordingly, we further hold that the trial court, having administered an immediate cautionary instruction, did not commit an abuse of discretion in denying Loa's motion for a mistrial on the basis of the testimony in question.[13]

### 2. Motion for mistrial based on alleged prosecutorial misconduct

■ If the cogency of Loa's motion for a mistrial based upon the complainant's testimony was meager, his contention that the trial court committed reversible error in failing to declare a mistrial by virtue of the DPA's comments—set forth *supra* in section I. of this opinion—in rebuttal to defense counsel's closing argument is virtually vaporous. The trial transcript clearly reflects that the DPA's rebuttal was responsive to defense counsel's closing argument regarding the state of the record—specifically, with respect to what evidence defense counsel did and did not controvert—and not to whether Loa chose not to testify in his own behalf. We share the trial court's view that the DPA's remarks in rebuttal implied nothing about Loa's failure to testify. Accordingly, we hold that the trial court did not commit an abuse of discretion in denying Loa's motion for a mistrial on that basis.

### C. The Trial Court Did Not Commit A Plain And Manifest Abuse Of Discretion In Sentencing Loa To Extended And Consecutive Terms Of Imprisonment.

As his final point of error on appeal, Loa asserts that the sentence imposed upon him by the trial court "was arbitrary and capricious, constituted cruel and unusual punishment, and was a clear and manifest abuse of discretion." For the reasons discussed in this section, we disagree.

**13.** *State v. Pemberton*, 71 Haw. 466, 796 P.2d 80 (1990), upon which Loa relies, is inapposite to the present matter. In *Pemberton*, the record was

> replete with examples of the prosecutor's disregard for [the][d]efendant's right to a fair trial. While the trial court acted properly in trying to cure any possible prejudice, the fact that defense counsel was repeatedly forced to

### 1. Extended term sentencing

■ As noted in section I. of this opinion, Loa was sentenced to extended terms, pursuant to HRS §§ 706–661 and –662. *See supra* notes 3 and 4. It has been the long-standing view of this court that "[e]ach of the subsections of [HRS] § 706–662 requires the trial court to engage in a two-step process to impose a sentence for an extended term. The first step involves a finding by the court that the defendant is within the class of offenders to which the particular subsection applies." *State v. Huelsman*, 60 Haw. 71, 76, 60 Haw. 308, 588 P.2d 394, 398 (1978); *see also Okumura*, 78 Hawai'i at 412, 894 P.2d at 109; *State v. Schroeder*, 76 Hawai'i 517, 527, 880 P.2d 192, 202 (1994). "[T]he ... rules of evidence apply to the proof of such facts in an extended term sentence hearing. . . ." *Huelsman*, 60 Haw. at 77, 588 P.2d at 399 (citing *State v. Kamae*, 56 Haw. 628, 548 P.2d 632 (1976)). The second phase of the process requires the sentencing court to "determine that the defendant's commitment for an extended term is necessary for the protection of the public." *Schroeder*, 76 Hawai'i at 527 & n. 17, 880 P.2d at 202 & n. 17 (citation and internal quotation signals omitted); *see also Huelsman*, 60 Haw. at 77, 588 P.2d at 398–99. " 'The procedural standards to which the second phase of an extended term sentence proceeding should be subject are those applicable to ordinary sentencing.' " *Schroeder*, 76 Hawai'i at 528, 880 P.2d at 203 (quoting *Huelsman*, 60 Haw. at 80, 588 P.2d at 400).

■ Loa does not dispute on appeal, nor did he at his sentencing hearing, that he is a "multiple offender," within the meaning of HRS § 706–662(4), *see supra* note 4, for purposes of the first of the two-step extended term sentencing analysis. Rather, he argues that

> object and the court [was] repeatedly forced to sustain those objections and to issue cautionary instructions [was] likely to have had the reverse effect of focusing the jury's attention on that evidence and the fact that it was being suppressed. *Cf. State v. Kahinu*, 53 Haw. 536, 498 P.2d 635 (1972), *cert. denied*, 409 U.S. 1126, 93 S.Ct. 944, 35 L.Ed.2d 258 (1973).

71 Haw. at 476, 796 P.2d at 85.

[w]hen the trial court admitted into evidence the eight police reports [regarding] other crimes ..., it violated the requirement [that] the ordinary rules of evidence apply and that proof of the factors giving rise to extended term sentencing must be proved beyond a reasonable doubt. The [trial] court's actions in admitting and considering the evidence and testimony in the police reports violated the rules of evidence because foundational requirements for the information were not established. Clearly, [Loa's] substantial due process rights were violated.

The defect in Loa's position is that the evidence about which he complains was relevant only to the second phase of the two-step extended term sentencing process, *i.e.*, the determination as to whether commitment for extended terms was "necessary for the protection of the public." Inasmuch as the procedural safeguards to which the second phase of the sentencing process were subject are merely "those applicable to ordinary sentencing," the HRE are not controlling. *See* HRE 1101(d)(3) ("The [HRE] (other than with respect to privileges) do not apply in ... [p]roceedings for ... sentencing[.]"); *cf. State v. Drozdowski*, 9 Haw.App. 583, 854 P.2d 238 (1993) (holding HRE inapplicable to sentencing proceeding involving imposition of mandatory minimum term of imprisonment; rather, defendant subject to "ordinary sentencing procedures," which entail "a fair opportunity ... to be heard on the issue of the defendant's disposition"). That being the case, and the trial court being mandated to consider Loa's "history and characteristics," *see* HRS § 706–606(1) (1993), *supra* at note 6, the trial court was clearly entitled to consider the police reports, as well as the testimonial evidence relating to them, for the limited purpose of ascertaining Loa's propensity for acting in a manner that endangered the public "in determining the particular [enhanced] sentence to be imposed." *See* HRS § 706–606, *supra* at note 6; *State v. Vinge*, 81 Hawai'i 309, 323, 916 P.2d 1210, 1224 (1996) ("In ascertaining the defendant's "characteristics" for the purposes of HRS § 706–606(1), ... a sentencing court may consider any and all accurate information that reasonably might bear on the proper

sentence for the particular defendant, given the crime committed." (Citation, internal quotation marks, and emphasis omitted.)) In any event, the record provides no basis for us to doubt the trial court's representations that it was basing its sentencing decision on "[t]he testimony that was elicited during the trial" and that "[t]he facts [adduced] at the trial during [Loa's] sexual acts, [Loa's] actions, [and Loa's] words speak for [themselves]."

Thus, we reject Loa's suggestion on appeal that "[i]t is expressly clear that the [trial] court was improperly punishing [him] for more than just the offenses at bar[.]" That suggestion is incompatible with the trial court's explicit statements to the contrary and in total disregard of the meticulous record that the trial court made of the factors that it actually considered in imposing sentence. *See* section I. of this opinion, *supra.* Not only did the trial court painstakingly address each of the factors enumerated in HRS § 706–606, but it also expressly spoke to all of the mitigating factors that Loa raised, including his youth, his dysfunctional family, his history of victimization from physical and sexual abuse, and the lack of any effective rehabilitative opportunities in the past. It is manifestly apparent from its extensive remarks that the trial court's sentencing decision was driven by (1) the cumulative character of the offenses for which Loa was presently being sentenced and (2) Loa's demonstrated and wholly inexcusable and gratuitous cruelty, brutality, callousness, and viciousness in committing those offenses.

We hold that the trial court did not commit a plain and manifest abuse of discretion in sentencing Loa to extended terms of imprisonment pursuant to HRS §§ 706–661 and –662.

### 2. *Consecutive sentencing*

Admittedly, the seven consecutive terms of life imprisonment with the possibility of parole plus the two consecutive twenty-year prison terms to which Loa has been subjected are severe. The question, however, is whether the trial court committed a plain and manifest abuse of discretion in imposing them.

In *Gaylord*, this court recently traced the history of the consecutive sentencing statute,

HRS § 706–668.5 (1993), *see supra* note 6, within the greater context of the sentencing scheme set out in HRS ch. 706. The following analysis is germane to the present case:

The 1986 enactment of HRS § 706–668.5 and transformation of HRS § 706–606 ... influenced the sentencing discretion of the courts in at least two respects—one general and the other specific. As a general matter, when exercising its broad discretion to impose any particular sentence so as to fit the punishment to the offense as well as to the needs of the individual defendant and the community, the sentencing court became obligated to consider the HRS § 706–606 "factors" as part of its decision making process. But specifically, and by the plain language of HRS § 706–668.5(2)—although subject, pursuant to HRS § 706–668.5(1), to presumptively concurrent sentencing in connection with multiple prison terms "imposed at the same time"—, the sentencing court became obligated to "consider the factors set forth in [HRS § ] 706–606" when determining whether multiple indeterminate prison terms were to run concurrently or consecutively.

....

... [A]lthough HRS § 706–606(2) [ (1993) ] mandates consideration of the four classic penal objectives—retribution/just punishment, deterrence, incapacitation, and rehabilitation—, the legislature has declared unequivocally that sentencing courts are to implement HRS § 706–606 from the perspective that the general sentencing scheme set out in HRS ch. 706 has shifted from a pre–1986 emphasis on rehabilitation to a post–1986 overriding aspiration "to afford just punishment." This is ... the retributive approach....

Accordingly, the fact that HRS § 706–606 is incorporated by reference into HRS § 706.668.5 has profound significance. Bearing in mind that all indeterminate (including consecutive) prison terms are inherently incapacitative, the legislative sentencing philosophy permeating HRS ch. 706 in general and HRS § 706–606 in particular dictates that discretionary consecutive prison sentences, pursuant to HRS § 706.668.5, may properly be imposed only if the penal objectives sought to be

achieved include retribution (*i.e.,* "just deserts") and deterrence....

....

... [C]onsecutive prison sentences, pursuant to HRS § 706–668.5, may properly be imposed only to achieve retributive, incapacitative, and deterrent objectives. Thus, at the very least, (1) the sentencing court must expressly intend that the defendant's period of incarceration be *prolonged* by virtue of the consecutive character of the prison terms (the retributive goal), and (2) the sentence must embody the forward-looking aim of *future* crime reduction or prevention (the deterrent goal).

*Gaylord,* 78 Hawai'i at 148–50, 154, 890 P.2d at 1188–90, 1194 (citations and footnotes omitted) (some brackets in original and some added) (emphases in original).

The offenses of which Loa was convicted were committed in an extraordinarily sadistic and cruel manner. His history tended to confirm that the sort of unprovoked and callous violence exhibited by these offenses was characteristic of his behavior and, if unchecked, was likely to continue in the future. We share the trial court's lack of doubt that "the community needs protection from ... these types of acts and from [Loa]." The trial court's sentence essentially assured that Loa, who was nineteen years of age at the time of trial, would not be free in the community to endanger others until, if ever, he was a much older man, unlikely to be capable of inflicting the type of harm on others of which he had amply demonstrated that he was presently capable, without apparent prior self-control or subsequent remorse.

If any matter cried out for the achievement of the retributive, incapacitative, and deterrent penal objectives, this is it. We hold that the trial court did not clearly exceed the bounds of reason or disregard rules or principles of law or practice to Loa's substantial detriment and, accordingly, that the trial court did not commit a plain and manifest abuse of discretion in sentencing Loa to consecutive terms of imprisonment pursuant to HRS § 706–668.5.

### 3. *Cruel and unusual punishment*

We now consider whether Loa's sentence rises to the level of constitutionally

cruel and unusual punishment. We hold that it does not.

"The standard by which punishment is to be judged under the cruel and unusual punishment provisions of both the United States and Hawaii Constitutions[14] is whether[,] in the light of developing concepts of decency and fairness, the prescribed punishment is so disproportionate to the conduct proscribed and is of such duration as to shock the conscience of reasonable persons or to outrage the moral sense of the community."

*Kumukau,* 71 Haw. at 226–27, 787 P.2d at 687 (quoting *State v. Freitas,* 61 Haw. 262, 267–68, 602 P.2d 914, 920 (1979)).

Given the heinous character of the offenses committed in this case and the primacy of the retributive, incapacitative, and deterrent objectives under the circumstances, we do not believe, in the light of developing concepts of decency and fairness, that Loa's prescribed punishment is so disproportionate to the conduct proscribed and is of such a duration as to shock the conscience of reasonable persons or to outrage the moral sense of the community.

D. *The Trial Court Committed Plain Error In Instructing The Jury That It Could Convict Loa Of The Nonexistent Offense Of Attempted Manslaughter Premised Upon An Intent Recklessly To Cause The Complainant's And Her Male Companion's Deaths; Being The Sole Basis Of Loa's Conviction Of That Nonexistent Offense, The Plainly Erroneous Instruction Could Not Have Been Harmless Beyond A Reasonable Doubt, And Loa's Conviction—As Well As The Sentence Resulting From It—Must Therefore Be Set Aside.*

■ As discussed *supra* in section I. of this opinion, the trial court instructed the jury that, "[i]f and only if" it was unable to convict Loa of the charged offense of attempted first degree murder, it was obligated to consider whether Loa committed the "included" offense of "attempted manslaughter" by attempting recklessly to cause the complainant's and her male companion's deaths [hereinafter, "attempted reckless manslaughter"].[15] After advising the trial court that it was unable to reach a unanimous decision regarding the charged offense, the jury returned a guilty verdict as to attempted reckless manslaughter.

In *Holbron,* 80 Hawai'i at 43–45, 904 P.2d at 928–30, we held that the Hawai'i Penal Code does not recognize the offense of attempted manslaughter based upon a defendant's reckless conduct and that a jury instruction purporting to describe that nonexistent offense was erroneous *per. se.* We held the erroneous instruction to be harmless beyond a reasonable doubt in that case, however, because the jury could never have reached it, having convicted the defendant of the charged offense of attempted murder. *Id.* at 45–47, 904 P.2d at 930–32. Such is obviously not the case in the matter presently before us.

The prosecution argues that, notwithstanding *Holbron,* Loa's attempted first degree murder conviction "should be affirmed under the circumstances of this case" because: (1) the erroneous attempted reckless manslaughter instruction [hereinafter, "the erroneous instruction"] was given at Loa's request; and (2) the erroneous instruction "obviously benefitted" Loa, inasmuch as, in its absence, "the jury would have had no alternative but to find [Loa] guilty of Attempted Murder in the First Degree." In the alternative, the prosecution urges that "this case should ... be remanded for a retrial on the original charge

---

14. The eighth amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Article I, section 12 of the Hawai'i Constitution parallels the eighth amendment and provides in relevant part that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

15. The jury instruction in question was given at Loa's request, pursuant to *State v. Tagaro,* 7 Haw.App. 291, 757 P.2d 1175, *cert. granted,* 69 Haw. 678 (1987), *cert. dismissed,* 70 Haw. 666, 796 P.2d 502 (1988), which was overruled in *Holbron,* 80 Hawai'i at 45, 904 P.2d at 930, after Loa was tried, convicted, and sentenced in the present matter.

of Attempted Murder in the First Degree," insofar as Loa was convicted of a nonexistent offense. All of the prosecution's arguments lack merit for a number of reasons.

First, it is of no consequence that the trial court gave the erroneous instruction at Loa's request. This is because

> the trial court is the sole source of all definitions and statements of law applicable to an issue to be resolved by the jury. Moreover, it is the duty of the circuit judge to see to it that the case goes to the jury in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is they are to decide, and he or she shall state to them fully the law applicable to the facts. And faced with inaccurate or incomplete instructions, the trial court has a duty to, with the aid of counsel, either correct the defective instructions or to otherwise incorporate it into its own instructions. In other words, the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel.

*State v. Kupau*, 76 Hawai'i 387, 394–95, 879 P.2d 492, 499–500 (1994) (citations, footnotes, internal quotation marks, brackets, and emphasis omitted).

Inasmuch as Loa was not charged with attempted reckless manslaughter, the trial court could only have given the erroneous instruction because it was under the mistaken impression that attempted reckless manslaughter was an offense "included" within attempted first degree murder for purposes of HRS § 701–109(4) (1993).[16] Of course, when

> there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense[,] ... it may be plain error for a trial court to fail to give an included offense instruction, even when

neither the prosecution nor the defendant have requested it[.]

*State v. Kinnane*, 79 Hawai'i 46, 49–50, 897 P.2d 973, 976–77 (1995) (citations, internal quotation marks, and footnote omitted). On the other hand,

> in the absence of such a rational basis in the evidence, the trial court *should not* instruct the jury as to included offenses. *A fortiori*, it is not error for a trial court to refuse—and the trial court should refrain from giving—an instruction regarding an uncharged offense that is not "included," for purposes of the Hawai'i Penal Code, within the charged offense.

*Id.* at 49, 897 P.2d at 976 (citations omitted) (emphases in original).

It is self-evident that, being nonexistent, attempted reckless manslaughter *cannot* be "included" within attempted first degree murder for purposes of HRS § 701–109(4). Because the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel, and because it may be plain error for a trial court to fail to give a proper included offense instruction, *Kinnane*, 79 Hawai'i at 50, 897 P.2d at 977, it is likewise self-evident that it may be plain error for a trial court to give an instruction regarding a nonexistent "included offense," even when the defendant has requested it by agreement with the prosecution. Indeed, the giving of such an erroneous instruction constitutes plain error as a matter of law when "there is a reasonable possibility that [the instruction] might have contributed to conviction," *Holbron*, 80 Hawai'i at 32, 904 P.2d at 917, because the error "seriously affect[s] the fairness, integrity, or public reputation of [the] judicial proceedings." *Fox*, 70 Haw. at 56, 760 P.2d at 676 (citation and internal quotation marks omitted).

---

16. HRS § 701–109(4) provides:

> A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:
>
> (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

> (b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or
>
> (c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating a lesser degree of culpability suffices to establish its commission.

Second, the prosecution's suggestion that the erroneous instruction "obviously benefitted" Loa—because the jury's only realistic alternative was to convict him, as charged, of attempted first degree murder—simply flies in the face of reality. As an initial matter, the prosecution ignores the " 'sound presumption of appellate practice[ ] that jurors are reasonable and generally follow the instructions that they are given.' " *Holbron*, 80 Hawai'i at 46, 904 P.2d at 931 (quoting *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991)).

The circuit court instructed the jury that if [and only if] it was unable to agree that the prosecution has proven beyond a reasonable doubt that [Loa] had committed the offense of Attempted Murder, the jury could then go on to consider the lesser included offense of "Attempted Manslaughter (Reckless Conduct)." . . .

We presume that the jury followed the circuit court's instructions and first considered the evidence with regard to the Attempted Murder charge. Consequently, the jury would first have considered the charged offense and would have gone on to consider any lesser offense only if they were unable to agree that the prosecution had proven that [Loa] was guilty of the charged offense beyond a reasonable doubt.

*Id.* (citation and emphasis omitted) (some brackets added and some omitted) (some quotation marks omitted and some in original). Thus, the fact that the jury reached the erroneous instruction at all signifies that it was unable to convict Loa of attempted first degree murder. *Cf. id.* at 47, 904 P.2d at 932 ("Because, under the circumstances of this case, in reaching a unanimous guilty verdict as to the charged offense of attempted murder . . ., the jury could not have reached, much less considered, the disputed instruction that erroneously described a nonexistent offense, there is no reasonable possibility that the error might have contributed to Holbron's conviction." (Citation, brackets, and internal quotation marks omitted.)).

Moreover, at Loa's request (and with the prosecution's concurrence), the trial court instructed the jury with respect to assault in the first degree, in violation of HRS 707–710 (1993), and reckless endangering in the second degree, in violation of HRS 707–714 (1993), as additional offenses "included" within the charged offense of attempted first degree murder. However, subsumed within these instructions was a directive that the jury could not consider these included offenses if it convicted Loa of attempted reckless manslaughter. The jury's guilty verdict thus precluded it from reaching them, an outcome that was hardly an "obvious benefit" to Loa.

Finally, the prosecution overlooks the fact that, in the absence of the erroneous instruction, the jury *may* have acquitted Loa altogether in connection with the attempted first degree murder charge. However compelling the evidence of criminal wrongdoing might have been,[17] such a possibility cannot be dismissed absolutely.

The erroneous jury instruction was not only "presumptively harmful," *see Holbron*, 80 Hawai'i at 32, 904 P.2d at 917, but necessarily contributed to Loa's conviction of the nonexistent offense of attempted reckless manslaughter. Obviously, in the absence of the erroneous instruction, Loa *could not* have been so convicted. That being the case, the erroneous instruction "seriously affect[ed] the fairness [and] integrity . . . of [the] judicial proceedings." *Fox*, 70 Haw. at 56, 760 P.2d at 676 (citation and internal quotation marks omitted). We therefore hold that it was plain error for the trial court to give it. Accordingly, we have no choice but to vacate Loa's conviction of attempted reckless manslaughter, as well as the extended twenty-year prison sentence that flowed from it.

■■■ As we have noted, the prosecution, anticipating this result, suggests on appeal that, should Loa's conviction be vacated, "this case should be remanded for a retrial on the original charge" of attempted first degree murder because Loa was convicted of a non-

---

17. In this connection, and given the record in this case, we have no doubt that a verdict convicting Loa of attempted first degree murder would have been supported by substantial evidence.

existent offense. We cannot oblige the prosecution because, despite its arguments to the contrary, to do so would violate HRS § 701–110(1) (1993),[18] Loa's constitutional right against double jeopardy,[19] and our holding in *State v. Feliciano*, 62 Haw. 637, 618 P.2d 306 (1980).

In *Feliciano*, the defendant was indicted for attempted murder but convicted of the included offense of reckless endangering in the second degree. On appeal, he asserted, *inter alia*, "that upon reversal of the original judgment, HRS 701–110 would bar retrial on the attempted murder charge." 62 Haw. at 638, 618 P.2d at 307. This court agreed, analyzing the defendant's position as follows:

The rule adopted by the United States Supreme Court ... and incorporated in HRS § 701–110(1) is that a defendant who has been convicted of a lesser included offense than that charged is deemed to have been acquitted of the greater charge. Thus a defendant may not be retried for any offense of which he has been acquitted, whether expressly or impliedly, notwithstanding a subsequent reversal of the judgment on appeal. *Price v. Georgia*, 398 U.S. 323, 328–29, 90 S.Ct. 1757, 1760–61, 26 L.Ed.2d 300 (1970); *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); ... Commentary to HRS § 701–110; 4 *Wharton's Criminal Procedure*, § 590 (12th ed. C. Torcia 1976).

The rationale for the above cited is two fold. First, the concept of double jeopardy is enhanced in that after an acquittal, a defendant is freed of the threat of renewed prosecution on the more serious charge. Commentary to HRS § 701–110. As the Supreme Court in *Green v. United States, supra,* put it:

... the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

355 U.S. at 187–88, 78 S.Ct. at 223–24. The fundamental policy of "no man is to be brought into jeopardy of his life more than once for the same offence," is effectuated and protected.

Second, such a rule does not inhibit a defendant in his decision of whether to appeal his conviction. The Commentary to HRS § 701–110 states, "If the defendant faces reprosecution for an offense of which he has been acquitted, he may be unfairly hampered in his decision about whether to contest the validity of the conviction for the lesser offense." Under the rule we discuss today, the [defendant] would not be coerced into waiving his right to appeal his conviction on the lesser included offense for fear of being reprosecuted on the more serious offense.

*Id.* at 644–45, 618 P.2d at 310–11 (footnotes and some citations omitted).

We have already ruled that Loa was not lawfully convicted of an included offense of attempted first degree murder because, in accordance with our holding in *Holbron*, at-

---

18. HRS § 701–110 provides in relevant part:

 **When prosecution is barred by former prosecution for the same offense.** When a prosecution is for an offense under the same statutory provision and is based on the same facts as a former prosecution, it is barred by the former prosecution under any of the following circumstances:

 (1) The former prosecution resulted in an acquittal which has not subsequently been set aside. There is an acquittal if the prosecution resulted in a finding of not guilty by the trier of fact or in a determination by the court that there was insufficient evidence to warrant a conviction. *A finding of guilty of a lesser included offense is an acquittal of the greater inclusive offense, although the conviction is subsequently set aside on appeal by the defendant.*
 (Emphasis added.)

19. The double jeopardy clause of the fifth amendment to the United States Constitution, made applicable to the states through the due process clause of the fourteenth amendment, *see Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." Analogously, article I, section 10 of the Hawai'i Constitution provides in relevant part that "[n]o person shall ... be subject for the same offense to be twice put in jeopardy."

tempted reckless manslaughter, being nonexistent, cannot be an offense "included" within any other. Nevertheless, the rationale underlying the constitutional protection against reprosecution following an acquittal and HRS § 701–110(1) preclude retrying Loa for attempted first degree murder, as originally charged. The jury having acquitted Loa of that charge by virtue of its verdict, we hold that Loa may not be retried for it.[20]

## IV. CONCLUSION

For the foregoing reasons, we vacate Loa's conviction of and sentence for attempted reckless manslaughter, which is a nonexistent offense. In all other respects, we affirm the trial court's judgment and sentence.

---

**20.** We emphasize, however, that remanding the case for retrial on *lesser included offenses* offends neither the fifth amendment to the United States Constitution nor article I, section 10 of the Hawai'i Constitution. *State v. Malufau*, 80 Hawai'i 126 at 136, 906 P.2d 612 at 622 (1995) [hereinafter referred to as *Malufau II*] (citations omitted).... For purposes of article I, section 10, a lesser included offense is an offense is an offense that is (1) "included" in a charged offense, within the meaning of HRS § 701–109(4) (1993), and (2) "of a class and grade lower than the greater [charged] offense," as described in HRS §§ 701–109(4)(a) and 701–109(4)(c). *Malufau II*, 80 Hawai'i at 138, 906 P.2d at 624; [*State v.] Malufau* ..., 80 Hawai'i [126,] 134, 906 P.2d [612,] 620 [ (1995) ].

*Wallace*, 80 Hawai'i at 415–16, 910 P.2d at 727–28 (some brackets in original and some added) (emphasis in original).