**Electronically Filed
Supreme Court
SCWC-13-0000061
31-OCT-2016
08:37 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee,

vs.

PATRICK DEGUAIR, JR., Petitioner/Defendant-Appellant.
_____

SCWC-13-0000061

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0000061; CR. NO. 08-1-0773)

October 31, 2016

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

This case arises out of the 2008 robbery of the Aiea Cue, in which three intruders restrained four individuals inside a pool hall and stole cash and other valuables.  Two of the intruders, Ju Young Woo ("Woo") and David Teo ("Teo"), entered

into cooperation agreements with the State, and the third intruder, Patrick Deguair, Jr. ("Deguair"), continued on to a jury trial.  Deguair's defense was that Woo and Teo coerced him into participating in the crime.  The jury found Deguair guilty on all counts:  Count 1 (Robbery in the Second Degree, a class B felony), Count 2 (Kidnapping as a class A felony), and Counts 3, 4, and 5 (Kidnapping as a class B felony).  The jury also answered interrogatories finding that each act of kidnapping was committed as a continuing course of conduct, with no separate and distinct intent from the robbery.  Therefore, pursuant to Hawaiʻi Revised Statutes ("HRS") § 701-109(1)(e) (2014), which prohibits multiple convictions for offenses committed as a continuing course of conduct, the Circuit Court of the First Circuit[1] merged Count 1 (the robbery, a lesser grade class B felony) into Count 2 (one of the kidnappings, a higher grade class A felony).

On appeal, Deguair argued that the circuit court erred in convicting him of kidnapping as a class A felony on Count 2, as he was entitled to the mitigating defense,[2] which would have reduced the kidnapping to a class B felony.  A majority of the

---

[1]    The Honorable Glenn J. Kim presided.
[2]    The mitigating defense is contained in HRS § 707-720(3) (2014).  It states, as it did at the time of the alleged offense, "In a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial."

Intermediate Court of Appeals ("ICA") agreed, vacating the circuit court's Judgment of Conviction and Sentence as to Count 2 as a class A felony and remanding the case for entry of a judgment of conviction on Count 2 as a Class B felony and for resentencing solely on Count 2.  State v. Deguair, CAAP-13-0000061 (App. Feb. 27, 2015) (mem.) at 3.  The ICA rejected Deguair's other points of error and affirmed the circuit court's judgment with respect to the convictions and sentences on Counts 3, 4, and 5.  Deguair, mem. op. at 16.

On certiorari, Deguair argues that all of his convictions are now of the same class (class B felonies).  He contends that HRS § 701-109(1)(e) requires the kidnapping convictions to be "merged" into the robbery conviction.  He also asserts that the ICA gravely erred in holding that the circuit court properly excluded prior bad act evidence that Woo and Teo were violent, worked for O'ahu criminal organizations providing protection, and needed money.  Deguair also contends that the ICA gravely erred in holding that the circuit court properly declined to declare a mistrial after the prosecutor questioned Deguair about whether he and Teo had shot guns at the Koko Head shooting range.[3]

---

[3]    Deguair also presents the following questions on certiorari, which we do not further address herein, as Deguair's arguments that the ICA erred are unpersuasive:

2)  Did the Intermediate Court of Appeals Gravely Err in Ruling That the Circuit Court Did Not Err in Denying the Motion to Suppress Evidence?

(continued . . .)

We hold that the ICA did not err in concluding that the circuit court did not abuse its discretion in granting the State's motion in limine as to the prior bad acts of Teo and Woo.  We also hold that the ICA did not err in concluding that the circuit court did not abuse its discretion in declining to declare a mistrial.  We hold, however, that the ICA erred in remanding this case for resentencing solely on the kidnapping conviction, foreclosing the possibility that the kidnapping convictions could merge into the robbery conviction.  We hold that, under HRS § 701-109(1)(e), Deguair committed the kidnappings as part of a continuous course of conduct in committing the robbery; therefore, the kidnapping convictions should merge into the robbery conviction.  Accordingly, we vacate the ICA's April 21, 2015 Judgment on Appeal, and the circuit court's January 2, 2013 Judgment of Conviction and Sentence.  On remand, the circuit court is directed to reinstate Deguair's conviction on Count 1[4], to dismiss the convictions on

---

(. . . continued)
 . . . .
  5)  Did the Intermediate Court of Appeals Gravely Err in
  Ruling That the Circuit Court Did Not Err in Denying
  Defendant's Motion for New Trial?

[4] Prior to entering its judgment of conviction and sentence on the four kidnapping offenses (Counts 2 through 5), the circuit court had dismissed the guilty verdict on the robbery offense (Count 1).  Therefore, in addition to vacating the circuit court's judgment of conviction and sentence, this court instructs the circuit court to reinstate the robbery conviction on Count 1.  See, e.g., State v. Timoteo, 87 Hawai'i 108, 109, 119, 952 P.2d 865, 866, 876 (1997) (instructing the circuit court to reinstate a jury's guilty verdict
(continued . . .)

Counts 2, 3, 4, and 5, and to resentence Deguair on Count 1 only, pursuant to HRS § 701-109(1)(e), as the kidnapping convictions merged into the robbery conviction.

## II. Background

### A. Indictment

On May 21, 2008, the State filed an Indictment against Deguair, Woo, and Teo alleging that they committed Robbery in the First Degree (Count 1), in violation of HRS § 708-840(1)(b)(ii) (2014).[5] The Indictment also alleged that they kidnapped Paul Beltran (Count 2), Ruth Lemons (Count 3), John Llacuna (Count 4), and Talagu Moliga (Count 5), all in violation of HRS § 707-720(1)(e) (2014).[6] Before trial, both Woo and Teo entered into plea agreements and agreed to testify for the State, and Deguair proceeded to trial on his own.

---

(. . . continued)
against the defendant for simple trespass and remanding the case to the circuit court for resentencing).

[5] That statute provides, in relevant part, as it did at the time of the alleged offense:

> **Robbery in the first degree.** (1) A person commits the offense of robbery in the first degree if, in the course of committing theft . . . (b) The person is armed with a dangerous instrument . . . and: . . . (ii) The person threatens the imminent use of force against the person of anyone present with intent to compel acquiescence to the taking of or escaping with the property. . . .

[6] That statute provides, as it did at the time of the alleged offenses, "(1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to: . . . (e) Terrorize that person or a third person. . . ."

**B.    The State's Motion in Limine No. 2**

On August 29, 2012, the State filed a Motion in Limine No. 1 requesting an order from the circuit court compelling Deguair to disclose "any and all evidence the defense intends to use" to support the anticipated duress[7] and choice of evils[8] defenses.

---

[7]    HRS § 702-231 (2014) codifies the duress defense.  It states, in relevant part, as it did at the time of the alleged offenses, the following:

> (1) It is a defense to a penal charge that the defendant engaged in the conduct or caused the result alleged because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.
> (2) The defense provided by this section is unavailable if the defendant recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was negligent in placing himself in such a situation, whenever negligence suffices to establish the requisite state of mind for the offense charged. . . .
> (5) In prosecutions for any offense described in this Code, the defense asserted under this section shall constitute an affirmative defense. The defendant shall have the burden of going forward with the evidence to prove the facts constituting such defense, unless such facts are supplied by the testimony of the prosecuting witness or circumstance in such testimony, and of proving such facts by a preponderance of the evidence pursuant to section 701-115.

[8]    HRS § 703-302 (2014) codifies the choices of evils defense.  It states, in relevant part, as it did at the time of the alleged offenses, the following:

> (1) Conduct which the actor believes to be necessary to avoid an imminent harm or evil to the actor or to another is justifiable provided that:
> (a) The harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;
> (b) Neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
> (c) A legislative purpose to exclude the justification claimed does not otherwise plainly appear. . . .

That same day, Deguair's counsel sent the State two letters setting forth prior bad act evidence concerning Teo and Woo that Deguair intended to proffer.  Two days later, on August 31, 2012, the State filed a Motion in Limine No. 2 seeking to preclude reference to the following allegations:

> 1.  David Teo is/was known as a strong arm and debt collector for Oahu crime organizations.
>
> 2.  David Teo participated in the "taxing" of legal and illegal gambling businesses for protection of their businesses.
>
> 3.  In [sic] or about March 2008, David Teo smashed a man's face into the windshield of a car while attempting to collect money from the man, in the parking lot of Tony Roma's restaurant in Pearl City.
>
> 4.  David Teo told Defendant Patrick Deguair, Jr. that he (David Teo) had just gotten out of jail and "needed this take."
>
> 5.  David Teo said to Defendant Patrick Deguair, Jr., "Remember what happened to the guy in the parking lot."
>
> 6.  Ju Young Woo protected criminal organizations operating in the Pearl City and Aiea Communities.
>
> 7. Ju Young Woo received and sold stolen motor vehicle parts.
>
> 8.  Ju Young Woo collected money for drug dealers.
>
> 9.  Ju Young Woo beat several people with a metal pipe on the bike path near the ABC Used Auto Parts.
>
> 10.  Aiea Cue was not paying its "tax" for protection to "the Samoans."
>
> 11.  Ju Young Woo needed money to pay a lawyer for representation concerning an arrest for stealing a tractor.

The State objected to the timing of the disclosure of this HRE Rule 404(b) evidence, as the trial had been pending for four years, and Deguair provided notice to the State of these bad acts with only two weeks before the start of trial.

7

At a hearing on the motion, Deguair's counsel argued that the bad act evidence was relevant to his duress and choice of evils defenses. Specifically, he argued that the jury needed to know what Deguair knew of Teo and Woo in order to judge whether a person of reasonable firmness would have been able to resist these men. The State counter-argued that the probative value of the evidence was "so attenuated" that it was "outweighed by 403 concerns. . . ."

The circuit court ruled as follows:

> I am going to . . . specifically make that 403 determination that any probative value this might have along the lines that [Deguair's counsel] has brought up as to that element of the duress defense . . . would be I think substantially outweighed by the danger of unfair prejudice and confusion of the issues, et cetera. . . . I'm going to grant the State's motion to preclude all of these except . . . three and five. Because . . . that is a threat, certainly an implied threat, the use of force that would go directly to the Defense's duress defense which I'm strongly inclined to include in this case when it goes to the jury.

## C. Trial

### 1. Undisputed Facts

The facts about the robbery elicited at trial are not disputed. Deguair did not deny his participation (with Teo and Woo) in robbing the Aiea Cue and kidnapping four individuals who were there. Instead, Deguair's primary defense was duress. He claimed he took part in Woo's plan because he was scared of Teo.

The facts elicited at trial regarding the events of April 3, 2008 were as follows. At closing time at the Aiea Cue, four

8

friends remained on the premises:  John Llacuna (the cashier), Ruth Lemons (Llacuna's girlfriend), Paul Beltran (who helped with cleaning and odd jobs), and Tony Moliga (security and parking lot attendant).  Beltran was at the back door trying to lock it, when he heard knocking.  Llacuna went to the door, when it suddenly burst open, and Teo, Deguair, and Woo entered.

Beltran ran toward the front door, and Teo pursued him, tackled him to the ground, handcuffed him behind his back, and left him face-down on the ground.  Llacuna, Lemons, and Moliga were herded to the rear of the Aiea Cue and ordered to lie face down and to relinquish their cell phones.  Teo later carried Beltran over to them.

It appeared that the three intruders were working together. Deguair used a crowbar to strike and redirect the videocameras. Woo used a torch to cut open the ATM and coin machine.  The cash register was also opened with a nearby key.  Teo, Deguair, and Woo exited the Aiea Cue after taking money and other property.

### 2.   Testimony of Woo

The State called Woo who testified that he met Deguair shortly before the Aiea Cue robbery.  Woo explained that Deguair was the mastermind behind the robbery and assigned Woo the job of cutting open the ATM and change machine, assigned Teo the job of getting people on the ground, and gave himself the job of redirecting the videocameras.  Woo testified that he did not

force Deguair to participate in the robbery, and that Deguair participated willingly. At the close of Woo's testimony, the State rested.

### 3. Testimony of David Teo

The defense called Teo, an acquaintance of Deguair's. He testified that the robbery was Deguair's plan, that he did not force Deguair to make a plan, and that Deguair participated willingly in the robbery.

### 4. Testimony of Patrick Deguair, Jr.

Outside the jury's hearing, before Deguair took the stand, Deguair's counsel asked the circuit court if he could elicit testimony that Deguair was afraid of Woo because he saw Woo kill a man in March 2008. The circuit court decided to allow the testimony to come in.

Deguair then took the stand. He testified that he witnessed Teo "walk[] up behind [a] guy and smash[] his head into" a car windshield, bloodying the man's face, and causing the man to pass out on the ground. He testified that Teo told him to buy an acetylene torch and fill it with gas a week before the Aiea Cue robbery.

Deguair also testified that he contacted Woo for motorcycle mirrors, and Woo asked Deguair to meet him at Aiea Cue and, later, the junkyard. Woo gave Deguair the mirrors at the junkyard. When Deguair asked how much he owed, Woo told him not

to worry about it and that Deguair could help him later.  Woo then started telling Deguair about his plan to rob the Aiea Cue.  Woo said people inside the Aiea Cue would let him in.  He intended to take $50,000 that he said was in a safe at the bottom of the change machine.  Woo asked Deguair to go with him to turn the videocameras up.  Deguair told him he could not be involved in the robbery because he had a good federal job.  Just then, an SUV pulled up and Teo exited and approached them.  While Deguair continued to turn Woo down, Teo "surprise[d]" Deguair, "got [him] from the side and . . . pin[ned Deguair's] head against . . . the SUV."  Teo banged Deguair's head on the side of the SUV and squeezed Deguair's neck.  Teo told Deguair, "Punk, I need this take. . . Remember what happened in the parking lot?  You like that happen to you?"  Deguair believed Teo was referring to the incident in the parking lot when Teo smashed a man's face into a car windshield.  At that point, Woo came closer to Deguair and said, "Come on, you gotta do this. . . . . Brah, I give you free parts. . . .  What?  You too good for us?  You cannot do this kind stuff when we need your help?"

Deguair testified that he got into the SUV because he was afraid of Teo.  He testified that Woo produced the crowbar.  When the group arrived at Aiea Cue, Deguair paused and did not get out of the SUV, so Teo said, "Punk, no make me come in there and get you."  Deguair testified that he did not go voluntarily

11

through the Aiea Cue door and he did not feel free to leave. Deguair admitted that he turned the videocameras towards the ceiling. Woo then told him to look for a "turbo box" by the cash register area, and Deguair complied. He went to the cash register area, but there was no box there, so Woo told Deguair to tell Teo that, and Teo started ransacking the cashier's area. Meanwhile, Woo started cutting the change machine open. Woo then called Deguair over and used his pry bar to pry open the machine. Woo ordered Deguair to get the kidnappees' cell phones, and Deguair complied.

At the end of Deguair's direct examination, the State asked the defense to make "an affirmative declaration on the record that it has abandoned the duress defense as to Woo concerning an alleged March 2008 murder at the ABC junkyard." The court declined to order the defense to do so, stating that the murder simply had not come up in Deguair's testimony.

Also on cross-examination, the following exchange took place between the State and Deguair:

> Q [by the State]:  Now, you had met David Teo before this April 3, 2008 robbery; right?
> A:  A few times, yes.
> Q: And you told us that when you were living at the Royal Gardens in Waikiki, he came over; right?
> A:  That's one of the times he came over, yeah.
> Q:  And isn't it true that before the April 3, 2008 robbery, you took David Teo to the Koko Head range to shoot guns?
> [Deguair's counsel]:  Objection.
> [The State]:  702-231(2).
> The Court:  Sustained.
> [Deguair's counsel]:  That's fine.

When court adjourned for the day, Deguair's counsel made an oral motion for mistrial due to the Koko Head shooting range question.  He argued he had no notice of that bad act evidence, and the parties had agreed to approach the bench and give the court an opportunity to rule on whether such evidence could be elicited.  The State counter-argued that the jury should hear the evidence to determine if Deguair had "recklessly place[d] himself in a situation whereby this alleged coercion can be exerted upon him," which renders the duress defense unavailable.  The State also argued that it had been trying to establish a relationship between Teo and Deguair before the robbery.

The circuit court considered the question to be "an ambush" and stated that it was "shocked" when the State asked the question, as it seemed to have come "out of left field."  It also considered the evidence to be "completely irrelevant" as well as "prejudicial."  The circuit court decided not to declare a mistrial, as that would be "way too drastic a remedy to correct this."  While the circuit court believed he had stricken the answer from the record, defense counsel pointed out that there was no answer because the circuit court had sustained the defense's objection.  The circuit court then stated that the question was "no harm, no foul."  The circuit court proposed striking the question and telling the jury to disregard it, but defense counsel did not ask the circuit court to do that.

Relevant to this exchange, the circuit court had instructed the jury at the start of trial as follows:

> If I sustain an objection to a question, for example, a witness is testifying, one of the attorneys is examining that witness and the attorney asks a question, the other attorney jumps up and objects, if I sustain the objection, it means I'm not going to allow the witness to answer the question. If something like that happens, don't speculate what the answer might have been. Don't speculate about the question. Don't speculate about my ruling. An unanswered question is just that. It's an unanswered question. It's not evidence of any kind.

Deguair's redirect testimony commenced the following day. Deguair again testified that he participated in the Aiea Cue robbery because he was afraid of Teo. He believed Teo could have killed him if Teo smashed his head into a windshield. The defense then rested.

### 5. The State's Rebuttal Evidence

The State put on rebuttal evidence by Teo and Woo that Deguair was not coerced into participating in the crime. Teo denied ever smashing a man's face into a car windshield. He also denied slamming Deguair against the side of the SUV and squeezing his neck. He denied reminding Deguair of how he smashed a man's face into a windshield, denied saying that he "needed this take," denied forcing Deguair into the SUV, denied asking Deguair to buy a torch kit and gas, and denied forcing Deguair out of the SUV at the Aiea Cue and telling him, "[P]unk, no make me get out and get you."

On rebuttal, Woo testified that when Deguair visited the junkyard ostensibly to discuss motorcycle mirrors, it was Deguair who said, "I'm not here about the mirrors." Woo denied asking Deguair to redirect the Aiea Cue videocameras, denied telling Deguair, "Come on, you got to do this for us," and denied that Deguair stated that he did not want to participate in the robbery. He also testified that he did not see Teo slam Deguair against the side of the SUV or choke him. Woo testified that Teo did not force or threaten Deguair to go into or out of the SUV. After rebuttal, the State rested.

### 6. Merger Sidebar

The jury was given a set of interrogatories asking whether the robbery and each of the kidnappings were committed through a continuous course of conduct and with no separate and distinct intent, mirroring the language of HRS § 701-109(1)(e), the statute at issue in this case. While the jury was deliberating, the circuit court asked for counsels' thoughts on what the circuit court should do in the event that the jury answered interrogatories in a manner that would result in the merger of the robbery and kidnapping convictions. The circuit court stated its inclination to merge the offenses by dismissing whichever conviction was a lesser grade felony. In the event all of the felony convictions were of the same grade, however, the circuit court stated it would invite counsels' input. The

State also agreed that that situation would require some thought and possible briefing. The circuit court then indicated that if all the convictions were of the same grade, it would dismiss the kidnapping convictions and find Deguair guilty of robbery only. The circuit court then stated that further briefing was not necessary at that time.

### 7. Verdict and Merger

The jury found Deguair guilty of robbery in Count 1 as a class B felony,[9] kidnapping in Count 2 as a class A felony, and kidnapping in Counts 3, 4, and 5 as class B felonies. The jury also found that Counts 1 and 2, Counts 1 and 3, Counts 1 and 4, and Counts 1 and 5 were "part of a continuing and uninterrupted course of conduct" and were committed "with one intention, one general impulse, and one plan encompassing both offenses," for purposes of the merger subsection of HRS § 701-109, subsection (1)(e). As a result, the circuit court dismissed Count 1 (robbery), consistent with its earlier decision that a class B robbery conviction had to merge into a higher class A kidnapping conviction.

---

[9]    The jury found Deguair guilty of robbery in the second (not first) degree. HRS § 708-841 (2014) states, as it did at the time of the alleged offense, "A person commits the offense of robbery in the second degree if, in the course of committing theft . . . [t]he person threatens the imminent use of force against the person or anyone who is present with intent to compel acquiescence to the taking of or escaping with the property[.]"

16

**8. Sentence**

The circuit court sentenced Deguair to 20 years' incarceration on Count 2 (class A kidnapping), and 10 years' incarceration each on Counts 3, 4, and 5 (class B kidnappings), with credit for time served, and with the sentences to run concurrently.  Deguair timely appealed.

**D.   ICA Appeal**

On appeal, Deguair argued that the circuit court erred in convicting him of kidnapping as a class A felony on Count 2, as he was entitled to the mitigating defense (that he voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial), which would have reduced the kidnapping to a class B felony.  A majority of the ICA agreed.  Deguair, mem. op. at 3.  The ICA therefore vacated Deguair's conviction and sentence on Count 2 and "remand[ed] the case for entry of a judgment of conviction on Count 2 as a class B felony and for resentencing on Count 2."  Id.

The ICA, however, rejected Deguair's argument that the kidnapping convictions should have merged into the robbery conviction.  It held, "Where the jury returns a verdict of guilty on two counts that merge, the State is given the option to decide which of counts subject to merger should be dismissed."  Id. at 10.  The ICA cited State v. Padilla, 114

17

Hawaiʻi 507, 517, 164 P.3d 765, 775 (App. 2007), for this proposition.  The ICA stated that the "State did not oppose the Circuit Court's decision to merge the robbery count into the separate kidnapping counts," and that, on appeal, "[t]he State does not argue that it would have objected to the Circuit Court's merger decision if the mitigating defense had been applied to Count 2."  Deguair, mem. op. at 10 & 10 n.4. Further, the ICA rejected Deguair's argument that all of the kidnapping convictions should have merged together, stating that he provided no authority for that proposition, and that each kidnapping count in Deguair's case "required proof of a separate and distinct intent with respect to each victim that were not subject to merger," citing State v. Correa, 5 Haw. App. 644, 706 P.2d 1321 (1985)).  Deguair, mem. op. at 10.

The ICA also rejected Deguair's argument that the circuit court erred in excluding prior bad act evidence concerning Woo and Teo for three reasons.  Id. at 14.  First, defense counsel's notice was untimely; second, the admission of the bad act evidence would have created a danger of unfair prejudice and confusion of the issues and prolonged the trial; and third, the circuit court allowed Deguair to present other evidence that supported his duress and choice of evils defenses.  Id.

Lastly, the ICA rejected Deguair's argument that the circuit court erred in failing to declare a mistrial following

18

the State's question about shooting guns at the Koko Head range. The ICA stated that it "need not resolve whether the State's question was improper," as the circuit court sustained defense counsel's objection to the question before Deguair gave an answer, defense counsel declined to have the circuit court strike the question, and the circuit court instructed the jury that an unanswered question was not evidence. Id. at 15. The ICA also considered the question to be "brief and isolated." Id. Finding no other errors by the circuit court, the ICA affirmed the circuit court's judgment of conviction and sentence as to Counts 3, 4, and 5.

## III. Standards of Review

### A. Motion in Limine: Prior Bad Act Evidence

"Prior bad act" evidence under Hawai'i Rules of Evidence (HRE) Rule 404(b) (1993) is admissible when "it is 1) relevant and 2) more probative than prejudicial." State v. Maelega, 80 Hawai'i 172, 183, 907 P.2d 758, 769 (1995) (citations omitted). A trial court's determination that evidence is "relevant" within the meaning of HRE Rule 401 (1993) is reviewed under the right/wrong standard of review. State v. Pulse, 83 Hawai'i 229, 247, 925 P.2d 797, 815 (1996). However, a trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule

403 (1993) is reviewed for abuse of discretion. See id. An abuse of discretion occurs when the court "clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Furutani, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994) (citations omitted).

**B.  Motion for Mistrial**

The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion. See State v. Loa, 83 Hawai'i 335, 349, 926 P.2d 1258, 1272 (1996) (citations omitted). The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. State v. Ganal, 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (citation and internal quotation marks omitted)).

**C.  Interpretation of HRS § 701-109(1)(e)**

"[T]he interpretation of a statute is a question of law reviewable de novo." State v. Tauilili, 96 Hawai'i 195, 197, 29 P.3d 914, 916 (2001) (citations omitted).

## IV.  Discussion

### A.  Motion in Limine: Prior Bad Act Evidence

We first address whether the ICA erred in concluding that the circuit court did not abuse its discretion in excluding prior bad act evidence concerning Woo and Teo.  On certiorari, Deguair argues that (1) two-week notice of the defense's intention to use Woo's and Teo's prior bad acts was sufficient time for the State to investigate and discuss the allegations with Woo and Teo; and (2) the full range of prior bad acts was necessary to show that the single incident allowed by the trial court (Teo's smashing a man's head into a windshield) was not an isolated incident and explained why Deguair took Teo seriously when he said, "Punk, I need this take."

We need not decide whether the defense provided reasonable notice to the State of the prior bad acts.  The circuit court did not abuse its discretion in excluding the evidence.  HRE Rule 404(b) provides that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

"The list of permissible purposes in Rule 404(b) is not intended to be exhaustive 'for the range of relevancy outside the ban is almost infinite.'"  State v. Clark, 83 Hawai'i 289, 300, 926 P.2d 194, 205 (1996) (citation omitted).  HRE Rule 403 provides, however, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In this case, the circuit court did not allow Deguair to present the following evidence:

> 1.  David Teo is/was known as a strong arm and debt collector for Oahu crime organizations.
>
> 2.  David Teo participated in the "taxing" of legal and illegal gambling businesses for protection of their businesses.
>
> . . . .
>
> 4.  David Teo told Defendant Patrick Deguair, Jr. that he (David Teo) had just gotten out of jail and "needed this take."
>
> . . . .
>
> 6.  Ju Young Woo protected criminal organizations operating in the Pearl City and Aiea Communities.
>
> 7. Ju Young Woo received and sold stolen motor vehicle parts.
>
> 8.  Ju Young Woo collected money for drug dealers.
>
> 9.  Ju Young Woo beat several people with a metal pipe on the bike path near the ABC Used Auto Parts.
>
> 10.  Aiea Cue was not paying its "tax" for protection to "the Samoans."

11.  Ju Young Woo needed money to pay a lawyer for representation concerning an arrest for stealing a tractor.

In this case, Deguair's argument for admitting this evidence was that it was relevant to his duress and choice of evils defenses. At trial, Deguair's defense was that Teo in particular (not Woo) coerced him into participating in the Aiea Cue robbery. Therefore, items 6, 7, 8, 9, and 11 of the State's Motion in Limine No. 2, which all concern Woo, were not relevant to Deguair's defense and were, therefore, properly excluded.  It should be noted that the circuit court did allow Deguair to present evidence that he saw Woo murder a man, but Deguair chose not to present that evidence.  Deguair's abandonment of that evidence further reinforces his focus on Teo, not Woo.

The remaining items related to Teo in the State's Motion in Limine No. 2 are items 1, 2, 4, and 10. (Item 10 stated that Aiea Cue had not been paying its protection money to the Samoans; it can be inferred that Teo, not Woo, would be the one concerned with collecting protection money, per item 2). Despite the preclusion of item 4, Deguair did manage to testify at trial that Teo told him, "Punk, I need this take," although he did not testify that Teo had just gotten out of jail.  In short, the remaining precluded evidence at issue on certiorari was that Teo was a strong-arm debt collector for crime organizations, that he collected protection money from legal and illegal businesses, that Aiea Cue was not paying its protection

money, and that Teo had just gotten out of jail.  Although each of these items could be probative of why Teo might have participated in robbing Aiea Cue, it is less probative of why Teo would force Deguair to participate.  This evidence was too attenuated from the duress issue, unlike the evidence that Teo smashed a man's face into a windshield, then reminded Deguair of that incident in order to secure Deguair's participation in the robbery -- evidence that the circuit court allowed.  In short, the circuit court did not abuse its discretion in precluding the evidence after weighing its probative value versus the danger of confusing the issues and misleading the jury.

## B.  Motion for Mistrial

We next address whether the ICA erred in concluding that the circuit court did not abuse its discretion in declining to declare a mistrial, after the prosecutor asked Deguair about shooting guns at Koko Head range.  When prosecutorial misconduct is the basis for a motion for mistrial, a new trial is warranted only where "the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. Kupihea, 80 Hawai'i 307, 316, 909 P.2d 1122, 1131 (1996) (citation omitted). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the reviewing court] consider[s] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength

or weakness of the evidence against [the] defendant." Id. (citations omitted).

Deguair argues that the nature of the alleged misconduct was "egregious":

> None of the witnesses testified that they saw any firearms or that anyone threatened to use a firearm. The mere mention of it by the prosecutor would serve no other purpose but to inflame the jury and prejudice them into believing that Deguair was a hard-core criminal ready and willing to use a gun.

With regard to the strength or weakness of the evidence, Deguair argues that the evidence against him was not strong because Woo and Teo were really the masterminds behind the robbery. As to the "promptness or lack of a curative instruction," Deguair acknowledges that the circuit court sustained the objection, and that defense counsel did not take the circuit court up on its offer to strike the question, but argues that the two other factors "should weigh in favor of a new trial."

With respect to the first factor, we disagree with Deguair that the prosecutor's question was egregiously improper. There is merit to the State's argument that it was trying to establish that a relationship existed between Teo and Deguair before the robbery that would have tended to negate the defense of duress. We agree with defense counsel and the circuit court, however, that the intention to offer this evidence should have been previously disclosed. We also agree with the circuit court that

declaring a mistrial in these circumstances would have been "way too drastic a remedy."

With respect to the second factor, the circuit court sustained defense counsel's objection to the question about shooting guns at Koko Head range prior to a response being given, had offered to strike the question (and defense counsel did not take the circuit court up on its offer), and had already previously instructed the jury as follows

> If I sustain an objection to a question, for example, a witness is testifying, one of the attorneys is examining that witness and the attorney asks a question, the other attorney jumps up and objects, if I sustain the objection, it means I'm not going to allow the witness to answer the question.  If something like that happens, don't speculate what the answer might have been.  Don't speculate about the question.  Don't speculate about my ruling.  An unanswered question is just that.  It's an unanswered question.  It's not evidence of any kind.

The jury is presumed to have followed the court's instructions. See State v. Knight, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996) ("[A]s a rule, juries are presumed to . . . follow all of the trial court's instructions.") (citation omitted).

Finally, Deguair argues that the evidence against him was not strong.  The undisputed testimony showed that Deguair participated in the robbery and kidnappings, and that the three intruders were working together.  There was contradictory testimony regarding Deguair's defenses of duress and choice of evils from his accomplices.  Deguair's former co-defendants Woo and Teo testified that Deguair masterminded the Aiea Cue

26

robbery, whereas Deguair testified that he was forced to participate. Although "a case of guilt is never 'strong' if evidence essential to conviction is the testimony of an alleged accomplice whose credibility the defendant subjects to severe attack," State v. Pokini, 55 Haw. 640, 645, 526 P.2d 94, 102 (1974), the undisputed testimony contradicted Deguair's duress and choice of evils defenses.

Under these circumstances, we believe that the prosecutor's question did not cause prejudice to Deguair's right to a fair trial. Therefore, we agree with the ICA that the circuit court did not abuse its discretion in declining to declare a mistrial.

## A. Merger

Lastly, we address whether the ICA erred in remanding this case to the circuit court solely for resentencing on Count 2 (kidnapping) as a class B felony. Before this court, Deguair argues that the kidnapping convictions should merge into the robbery conviction. HRS § 701-109(1)(e) provides the following:

> (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if: . . .
> (e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

HRS § 701-109 "interposes a constraint on multiple convictions arising from the same criminal conduct." State v. Matias, 102 Hawai'i 300, 305, 75 P.3d 1191, 1196 (2003). The commentary to

HRS § 701-109 states that the statute "reflects a policy to limit the possibility of multiple convictions and extended sentences when the defendant has basically engaged in only one course of criminal conduct directed at one criminal goal, or when it would otherwise be unjust to convict the defendant for more than one offense." The "one course of criminal conduct directed at one criminal goal" in this case was the robbery of the Aiea Cue. The jury found that each kidnapping was committed as a continuing course of conduct, with no separate and distinct intent from the robbery. The kidnappings of Beltran, Llacuna, Lemons, and Moliga were committed solely in furtherance of the robbery. Therefore, we agree with Deguair that the kidnapping convictions should merge into the robbery conviction.

The State maintains that under Padilla, it is the State's prerogative to elect whether the kidnapping convictions should merge into the robbery conviction or vice versa. The State therefore endorses the ICA's conclusion in its memorandum opinion in this case that Padilla, 114 Hawaiʻi 507, 164 P.3d 765, allows the prosecution to determine how criminal convictions should merge. Deguair, mem. op. at 10. Padilla is distinguishable. In Padilla, the circuit court plainly erred by failing to give a merger instruction in the first place. Padilla, 114 Hawaiʻi at 517, 164 P.3d at 775. The usual remedy in that instance is a retrial. Id. On appeal, however, the

28

prosecution suggested dismissing one of the defendant's convictions to remedy the defect, rather than face wholesale retrial.  Id.  The ICA in Padilla agreed with the prosecution's suggested remedy.  Id.  Padilla, therefore, does not stand for the blanket proposition that the prosecution determines how multiple convictions of the same class merge.

We further note that the ICA observed that "[t]he State does not argue on appeal that it would have objected to the Circuit Court's merger decision [i.e., the merger of the robbery conviction into the kidnapping convictions] if the mitigating defense had been applied to Count 2."  Deguair, mem. op. at 10 n.4.  Actually, the State made no election on appeal in this case.  Further, at trial, the State expressed its desire to brief the merger issue in the event all of the convictions were of the same class.  While the jury was deliberating, the circuit court asked for counsels' thoughts on what the circuit court should do in the event that the robbery and kidnapping convictions merged and all were of the same class.  The circuit court stated its inclination to convict Deguair of robbery and dismiss all of the kidnapping convictions, if all the convictions were class B felonies.  The State asked for an opportunity to brief how merger would operate under those circumstances, and the defense stated it had no objection to further briefing.  The circuit court also decided that if one of

the kidnapping convictions came back as a class A felony, and the rest of the convictions came back as class B felonies, the circuit court was required to merge the robbery conviction into the kidnapping convictions.  The jury returned precisely that combination of convictions, so there was no further opportunity to discuss how merger would operate where all of the convictions were of the same class.

The ICA also held that each kidnapping conviction must stand because "the kidnapping counts charged in this case required proof of a separate and distinct intent with respect to each victim and were not subject to merger."  Deguair, mem. op. at 10.  For this proposition, the ICA cited to Correa, 5 Haw. App. 644, 706 P.2d 1321.  Correa, however, does not apply.  At issue in Correa was whether kidnapping was a lesser included offense of robbery under HRS § 701-109(1)(a), not whether kidnapping and robbery should merge as part of a continuing course of conduct under HRS § 701-109(1)(e).  Further, in this case, the question is not whether each kidnapping merged with the other kidnappings, but whether each kidnapping merged into the single robbery offense.  Therefore, Correa does not, as a matter of law, foreclose the possibility that the kidnapping convictions could be dismissed upon merger into the robbery conviction.  Indeed, the jury's answers to interrogatories indicated that the jury found that each kidnapping was part of a

continuous course of conduct, and committed with no separate and distinct intent from the single robbery.

Therefore, the ICA erred in remanding this case to the circuit court solely for resentencing on Count 2 (kidnapping as a class B felony), foreclosing the possibility that the kidnapping convictions could merge into the robbery conviction. We hold that, under HRS § 701-109(1)(e), Deguair committed the kidnappings as part of a continuous course of conduct in committing the robbery; therefore, the kidnapping convictions merge into the robbery conviction.

### V.    Conclusion

The ICA did not err in concluding that the circuit court did not abuse its discretion in excluding the prior bad act evidence concerning Teo and Woo. The ICA also did not err in concluding that the circuit court did not abuse its discretion in declining to declare a mistrial. The ICA did err, however, in remanding this case for resentencing solely on the Count 2 kidnapping conviction, as the kidnapping convictions merged into the robbery conviction. Accordingly, we vacate the ICA's April 21, 2015 Judgment on Appeal, and the circuit court's January 2, 2013 Judgment of Conviction and Sentence. We remand this case to the circuit court and direct it to reinstate Deguair's conviction on Count 1, to dismiss the convictions on Counts 2, 3, 4, and 5, and to resentence Deguair on Count 1 only, pursuant

to HRS § 701-109(1)(e), based on the merger of Counts 2 through 5 into Count 1.

| | |
|---|---|
| Dwight C.H. Lum<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| James M. Anderson<br>for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |

